MARRS, Superintendent of Public Instruction, et al. v. MUMME et al.

No. 8415.

Court of Civil Appeals of Texas. San Antonio.

Feb. 6, 1930.

Rehearing Denied Feb. 26, 1930.

R. L. Bobbitt, Atty. Gen., and Rice M. Tilley, Asst. Atty. Gen., for appellants.

King & York, of Austin, for appellees.

FLY, C. J.

This is a suit instituted by Lillie Mae Mumme, a minor, by her next friend, Mrs. Louise Mumme, and the latter in her own right, against S. M. N. Marrs, state superintendent of public instruction, Nat Washer, chairman of the board of education of Texas, together with eight other members of that board, W. Gregory Hatcher, treasurer of the state of Texas, and Sam Houston Terrell, comptroller of public accounts of the state of Texas, to obtain a temporary writ of injunction restraining the defendants, appellants herein, from performing any of the duties under a statute passed by the present Legislature, known as the Rural Aid Bill; to restrain each and every member of the state board of education from directing the comptroller of public accounts to draw warrants, and restraining said comptroller from drawing or issuing the same; and restraining the treasurer of the state of Texas from disbursing any of the state's funds under said Rural Aid Bill, and restraining them and all of them from complying with the provisions of the act. It was prayed also that the writ of injunction be made permanent. The petition was presented to the trial judge on January 2, 1930, and on January 25, 1930, the temporary injunction sought by appellees was granted in favor of Louise Mumme, but denied as to the minor, Lillie Mae Mumme.

The application for injunction is based on the unconstitutionality of the act passed at the Third Called Session of the Forty-First Legislature (chapter 14), known as Senate Bill No. 3, which is an appropriation of $2,500,000 per year, or so much thereof as may be necessary for the next two fiscal years, for the purpose of promoting the public school interest of rural schools and equalizing the school opportunities afforded by the state to all children of scholastic age, living in small and financially weak districts, and attaching conditions, regulations, and limitations relative thereto, etc. The bill passed the Senate by a vote of twenty-four yeas and no nays, and the House, with amendments, by ninety-four yeas and seven nays. The bill went into conference on amendments adopted by the House, and the report of the committee was adopted by a vote of twenty-three yeas and no nays in the Senate, and by a viva voce vote in the House.

It is alleged in the petition that Lillie Mae Mumme is eleven years of age, and is enrolled

and attends a public free school in Medina county, in a rural district having six children within the scholastic age, and in which a school is conducted for three months, and in which a maintenance tax of 10 cents on each $100 worth of taxable property in the district is levied; that said school has no library, no desks, no seats, no blackboards, maps, or charts approved by the state superintendent; that the district is twenty miles from the county seat of Medina county, and that school "is not maintained for Indians, but for white children of that district."

It is provided in the act assailed that the state aid provided by the act may be distributed in such a way as to assist all schools of not more than 300 scholastics, located in districts of not more than 400 scholastic census enrollment, and consolidated districts which have an average of not more than 200 scholastics, to maintain the school solely out of state and county available school funds, for a term not to exceed six and one-half months. It is provided, as a condition to receive aid from the appropriation, that each school receiving aid shall be provided with a suitable schoolhouse, located on a plot of ground not less than one acre in extent and properly drained; that it shall be provided with desks, seats, blackboards, library, maps, and charts, with such heating and ventilating equipment and such sanitary closets as are approved by the state superintendent or his representative. It is also provided that no district, common or independent, shall receive aid from the appropriation which has not voted and levied a local school tax of not less than 75 cents on the $100. It is also provided that no one-teacher school, with an enrollment of more than 20 pupils, shall receive aid, if such school offers work above the seventh grade. It is provided that the aid shall be allotted on the basis of one teacher for 21 to 35 scholastics, two teachers for 36 to 65, three teachers for 66 to 95 scholastics, and four teachers for any number from 96 to 125; five teachers for any number from 126 to 155; and at the same rate for additional teachers.

Our state government is divided into three distinct departments, each of which is confided to a separate body of magistracy; namely, those which are legislative to one, those which are executive to another, and those which are judicial to another. Article 2, § 1, state Constitution.

■ The three departments of state being placed on a parity with each other, with absolute control of the matters confided to them by the organic law, no interference one with the other can be justified, unless there is a clear infraction of some constitutional provision rendering the act null and void. It is one of the most delicate and important exercises of judicial power for a court to strike down the act of a co-ordinate department of the government of equal dignity with itself. Courts shrink from the performance of such a duty, and will never exercise their power in declaring legislative acts invalid, if it can be properly avoided, or unless it appears beyond doubt that the legislative act is unconstitutional. This reluctance to exercise judicial power over legislative acts has prompted courts in a few instances to decline to exercise authority over the acts of Legislatures, and the rule has been adopted in some courts of last resort that they will not decide an act unconstitutional and consequently void, by a bare majority. As said by Chief Justice Marshall in the case of Briscoe v. Commonwealth's Bank of Kentucky, 8 Pet. 118, 122, 8 L. Ed. 887: "The practice of this court is, not (except in cases of absolute necessity) to deliver any judgment in cases where constitutional questions are involved, unless four judges concur in opinion, thus making the decision that of a majority of the whole court." In the case of Chapin v. Frank, 236 S. W. 1006, 1009, which was decided by this court in December, 1921, a writ was granted and the judgment affirmed on June 26, 1924; then, after more than four years, was reversed in the latter part of 1928; its history making it a cause celebre. In the opinion Associate Justice Smith used the following language, which we reiterate: "The question presented is one of far-reaching importance, and is entitled to great consideration. It has its difficulties, which we have approached with diffidence, and, we hope, with a proper sense of the responsibility involved in their solution. To set aside and hold for naught a solemn enactment of the Legislature is a grave responsibility when assumed by a court, and yet it is not more so than to give validity to a statute that is vicious in its effect and in derogation of the organic law of the land. It is well settled, of course, that every statute is presumed to be valid unless the contrary is clearly apparent; that every reasonable intendment is indulged, and every reasonable doubt resolved, in favor of its validity, so that to reasonably doubt is but to declare its validity." Although the judgment of this court eventually was driven upon the hidden rocks, still, on its perilous voyage of many years through the various Commissions of Appeals, the rule quoted was not assailed or questioned.

■ Another rule that must be kept in view when passing upon the constitutionality of a legislative act is that a court cannot declare an act unconstitutional solely on the ground of unjust and oppressive provisions, or because it is supposed to violate the natural, social, or political rights of the citizen, unless it is clearly shown that such injustice is prohibited or such rights guaranteed or protected by the Constitution. Cooley, Cons. Lim. pp. 232, 233.

It must also be kept in view that the same rules do not apply in construing the Constitution of the United States and that of a state. As said by Cooley, Constitutional Limitations (7th Ed.) p. 242: "The government of the United States is one of *enumerated* powers; the governments of the States are possessed of all the general powers of legislation. When a law of Congress is assailed as void, we look in the National Constitution to see if the grant of specified powers is broad enough to embrace it; but when a State law is attacked on the same ground it is presumably valid in any case, and this presumption is a conclusive one, unless in the Constitution of the United States or of the State we are able to discover that it is prohibited. We look in the Constitution of the United States for grants of legislative power, but in the Constitution of the State to ascertain if any *limitations* have been imposed upon the complete power with which the legislative department of the State was vested in its creation." Of course, these rules must be taken in a reasonable and conservative sense, and not with the idea that no state law can be declared unconstitutional, unless it is forbidden in specific terms in the Constitution.

Recurring again to that important matter, judicial doubts on constitutional questions, we quote Chief Justice Marshall in Fletcher v. Peck, 6 Cranch, 87, 128, 3 L. Ed. 162: "The question, whether a law be void for its repugnancy to the Constitution, is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station, could it be unmindful of the solemn obligations which that station imposes. But it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other." This was said by the Chief Justice of perhaps the grandest assize of all countries and all ages, in passing upon the constitutionality of a law of the state of Georgia. Cooley, Cons. Lim. p. 255.

Keeping these rules in view, we approach consideration of the law, which the learned and conscientious trial judge considered for more than three weeks before declaring it unconstitutional and void, at least indicating some possible doubts as to the unconstitutionality of the law.

■ It is the claim of appellees that the act is violative of sections 2, 3, 4, and 5 of article 7 of the state Constitution, all of which relate to public free schools. Section 2 defines the perpetual or permanent school fund as consisting of all funds, lands, and other property theretofore set apart and appropriated for the support of public schools, all the alternate sections of land reserved by the state out of grants heretofore made or that may hereafter be made to railroads or other corporations of any nature whatsoever, one-half of the public domain of the state, and all sums of money that may come to the state from the sale of any portion of the same. The mere definition of the perpetual school fund destroys any semblance of a basis for an attack on the act in question as in any way touching that fund.

■■ Section 3 of the Constitution provides for an available fund consisting of occupation taxes, poll taxes of $1 on every inhabitant of the state between twenty-one and sixty years of age, and an annual ad valorem tax of an amount not to exceed 35 cents on the $100 valuation, as with the available fund arising from other sources to maintain and support the schools for a period of not less than 6 months in the year and give free textbooks for the use of the children, and, if the fund provided for is not sufficient for the purposes indicated, the deficit may be met by appropriations from the general fund. Section 4 provides for the sale of school lands and the investment of funds arising from the sale of such lands.

The only provision made in section 3 for the appropriation of the general fund is limited to making up a deficit in the funds arising from the other sources specified, and any part of the general fund becoming available must be limited to that appropriated to meet the deficit explicitly defined. There is no other express authority given in the Constitution for transforming general funds into available school funds. The mentioning of the power to cover deficits from the general fund under circumstances specifically named would exclude power to divert the general fund to the available school fund under other circumstances, as covered by the law of the Forty-First Legislature. The object of the appropriation was not to augment and add to the available school fund, but "for the purpose of promoting the public school interest of rural schools and equalizing the educational opportunities afforded by the State to all children of scholastic age living in small and financially weak school districts." There was no attempt to supplement the amounts collected from the different sources named in section 3, art. 7, of the Constitution. We conclude that the affirmative power given in the article and section cited prohibits the diversion of the general fund to the available school fund as defined, under any other circumstances. As said by the Court of Appeals in People v. Draper, 15 N. Y. 532, 544, after adverting to express restraints on legislative action: "But the affirmative pre-

scriptions, and the general arrangements of the constitution, are far more fruitful of restraints upon the legislature. Every positive direction contains an implication against anything contrary to it, or which would frustrate or disappoint the purpose of that provision. The frame of the government; the grant of legislative power itself; the organization of the executive authority; the erection of the principal courts of justice, create implied limitations upon the law making authority as strong as though a negative was expressed in each instance; but independently of these restraints, express or implied, every subject within the scope of civil government, is liable to be dealt with by the legislature. As it may act upon the state at large, by laws affecting at once the whole country, and all the people, so it may in its discretion, and independently of any prohibition, expressly made or necessarily implied, make special laws relating to any separate district or section of the state."

■ If our construction of section 3 of article 7 be correct, then the provisions of section 5 of the same article are in no manner assailed by the Rural School Act. The money appropriated under the act was no part of the available school fund provided by the Constitution, and the constitutional provisions as to distribution of the school fund should not be consulted in testing the constitutionality of the act. Section 5 relates to the permanent school fund, and to the appropriation of that fund and the available school fund, and, as the money covered by the act now being considered is not stamped with the characteristics of either, the section has no application to it whatever, and the provisions as to distribution of the permanent or available school fund can have no reference to the appropriation of the $5,000,000.

The Constitution makers never contemplated that any appropriation of general funds to assist certain neglected school districts would in some magic way convert the appropriation into available school funds and defeat the purposes of the legislation by rendering necessary a per capita distribution of the money to every scholastic in Texas. Some hard things have been charged to the Constitution, but we do not believe that it can be so warped and distorted as to prevent the more than 300,000 children in the rural communities from receiving aid, which all students of our public school system realize is absolutely demanded, if the system is made to serve, not a favored portion, but all the children of the state.

The appellees in this suit, be they figureheads, passive instruments in the hands of others in prosecuting, or active agents, have lifted the curtain from a picture which the representatives of all the children of Texas seek to blot out forever. A school, without any modern conveniences, taught by one teacher, for only three months per annum, is depicted by appellees in the petition which seeks to disconnect and destroy the life line thrown out by the legislative department to save unfortunate children from being submerged from ignorance and consequent degradation. The rural district in which Mrs. Mumme and her little girl reside has no schoolhouse fit for the teaching of children, and it is used for school purposes for a time totally inadequate; and the inhabitants, content to levy a tax totally inadequate to improve their condition, are permitting themselves to be placed in the position of attempting to destroy a law passed to ameliorate their condition.

The evidence shows that the fund provided under the assailed act is so administered as to benefit about 3,500 school districts in Texas, and will enable over 300,000 children in rural districts to have longer school terms; and that $400,000 will be expended to pay tuition for high school students who live in rural districts. Thus the Legislature has sought to aid the thousands of children in Texas who are inadequately supplied with the means to the amount of education absolutely necessary in this age of contest and striving for the necessities, if not the luxuries, of human existence.

■ The law is assailed as unconstitutional because it creates an inequality in the distribution of the fund, in that no common or independent school district shall receive aid which does not levy a tax of not less than 75 cents on the $100 property valuation for the maintenance of the schools. It is contended that such provision is subversive of constitutional privileges by giving to some separate exclusive emoluments, abridges privileges given under the Fourteenth Amendment to the Constitution of the United States, and deprives Texas children of life, liberty, or property without due process—all of which is without any foundation in law and utterly untenable. The act does not deprive any child or citizen of Texas of any right held by them under the Constitution and laws. The child whose parents and friends resist being aroused from their Rip van Winkle slumber can still attend school for three months annually in a house inadequate for school purposes, but the appropriation fails if they will not arouse themselves and join the modern procession of progress and civilization. The law merely says to them: "Help yourselves and we will help you." The law, instead of discriminating against certain districts, is endeavoring, with a little aid on their part, to give them at least some of the advantages of more favored communities; instead of impairing the Constitution, it seeks to render real the clause of the Constitution which says: "A general diffusion of knowledge, be-

ing essential to the preservation of the liberties and rights of the people, it shall be the duty of the legislature of the state to establish and make suitable provision for the support and maintenance of an efficient system of public free schools." The plan of per capita distribution of the public school fund has been inadequate to support and maintain "an efficient system of public free schools" as is known by every citizen of the state, and imperative necessity calls for other modes and methods in order to obey the mandate of the Constitution. In well populated and wealthy communities, the per capita of the school fund is supplemented, not only by 75 cents on the $100 of taxable property, but by many times 75 cents, and, while these communities are enjoying the blessings of modern education, the less populous, poorer communities are obtaining little good from their sparse per capita, and the Legislature, made up largely of representatives from the country districts, have sought for years for a scheme or plan by which the deplorable situation might be remedied. They understood that little could be accomplished without the active co-operation of the rural districts, and realized that such co-operation would be more expeditiously and effectually obtained by interesting their money in the scheme.

■ It is insisted that the law is discriminatory, in that it requires of each district to be benefited by the act, the levying of a reasonable tax, the building and equipping a schoolhouse suited to the needs of the children. What citizen worthy of the name of American will complain at the levy of such a tax, especially when it will procure sufficient state aid and supervision to the betterment of the educational facilities of their children or those of their neighbors?

In regard to the argument that such schools as that described in the testimony in this case will be unable to obtain the benefits of the appropriation by the provision of the act, attention should be called to the provision that, in case of extraordinary and unusual conditions, where it can be shown that its own resources are insufficient, the state board of education may arrange for the support of a rural school from state aid funds for a period of not exceeding seven months, even though the school district be unable to comply with all the conditions of the act, except

as to the local tax. The law also makes provision for the consolidation of districts so as to lighten the burdens and increase the facilities for education.

The conditions prescribed in the different districts are denounced as unconstitutional, discriminatory, and tyrannical, but the fact is that several of our laws have such provisions to be complied with by citizens in order to receive the benefits of the law. The law is not discriminatory because it creates a class of districts and treats them all alike. Every one is compelled to meet reasonable conditions, and the law seems solicitous to obtain equal and exact justice. Certain conditions are required to obtain state or federal aid for the construction of public roads, and the dredging of harbors is often coupled with the provision that the localities shall contribute a certain pro rata of the cost; and, in obtaining the location of Randolph air field near San Antonio, the government required a gift by the city of 2,500 acres of land costing approximately $500,000.

■ It is even contended that the appropriation act is unconstitutional because it seeks, in violation of sections 3 and 19 of article 1 of the Constitution to deprive appellees of property, privileges, or immunities without due course of law. In fact, it seems to have been an open season for the slaughter of constitutional provisions, when through this simple appropriation bill, passed to enhance the educational privileges of one-third of a million school children in Texas, it is claimed the Legislature took a pot shot at some ten or twelve sections of the state Constitution, together with the Fourteenth Amendment to the Federal Constitution, and grievously wounded them. Contrary to rules of construction, doubts have been resolved against the action of the representatives striving to help over 300,000 school children, who will suffer great injury, for which they will be without a remedy, from the granting of the writ, when the damage resulting from a refusal of the writ would be so infinitesimal as to defy computation. Pomeroy, Eq. Jur. § 1685.

The order of the district judge granting the temporary injunction is reversed, and it is the order of this court that the temporary injunction prayed for be denied, and that appellees pay all costs in this behalf expended.