Leon SHEPHERD et al., Appellants,

v.

SAN JACINTO JUNIOR COLLEGE DIS-
TRICT et al., Appellees.

No. A-8712.

Supreme Court of Texas.

Dec. 19, 1962.

Rehearing Denied Jan. 16, 1963.

Charles B. Spicer, Jr., Pasadena, An-
drews, Kurth, Campbell & Jones, Houston,
Homer Mabry and Hall E. Timanus, Hous-
ton, with above firm, for appellants.

Stanley D. Baskin, Pasadena, Ernest A.
Knipp, Houston, for appellees.

NORVELL, Justice.

The question involved in this appeal is
whether or not that portion of Article
2815h, § 7 Vernon's Ann.Civ.Stats.[1] which
provides that a junior college district may
levy and collect a local ad valorem tax for
the support and maintenance of a junior
college is a valid constitutional enactment.

The appellants, Leon Shepherd and oth-
ers, own real property within the boundaries
of the appellee, San Jacinto Junior College
District which is organized as a Union
Junior College District under the provisions
of Article 2815h, Vernon's Ann.Tex.Stats.
Said landowners, as plaintiffs in the Dis-
trict Court, sought to enjoin the collection
of a local ad valorem tax levied by the
school district for maintenance purposes.
They recognized the legal existence of the
district and conceded that the tax is au-
thorized by the wording of Article 2815h, §
7, but asserted that the statute is unconsti-
tutional insofar as it undertakes to author-
ize the levy of ad valorem taxes for the sup-

[1] "Sec. 7. The Junior College District
created under this Act shall have the
power to issue bonds for the construction
and equipment of school buildings and
the acquisition of sites therefor, and to
provide for the interest and sinking fund
for such bonds by levying of such taxes
as will be necessary in this connection.
*The Junior College District shall also
levy and collect taxes for the support*
*and maintenance of the Junior College,*
provided that no bonds shall be issued
and no taxes shall be collected until by
vote of the majority of the qualified voters
of the Junior College District, at an elec-
tion called for that purpose in accord-
ance with the provisions of the General
Law providing for similar elections in
Independent School Districts, such bonds
and taxes are authorized. * * * "

port and maintenance of a junior college. The trial court upheld the validity of the statute and denied the injunction. Leon Shepherd and his co-plaintiffs have appealed to this Court as permitted by Article 5, § 3b, Texas Constitution, Article 1738a, Vernon's Ann.Tex.Stats. and Rule 499a, Texas Rules of Civil Procedure.

■ Preliminary to setting forth the contentions of the parties, we may properly allude to some well-recognized principles of constitutional law which are applicable here. A state constitution, unlike the federal constitution, is in no sense a grant of power but operates solely as a limitation of power. "All power which is not limited by the constitution inheres in the people, and an act of a state legislature is legal when the Constitution contains no prohibition against it." Watts v. Mann, Tex.Civ. App., 187 S.W.2d 917, wr. ref., 11 Am.Jur. 619, Constitutional Law, § 18. All intendments are against restrictions upon the legislative power and the applicable rule was stated by this Court in State v. Brownson, 94 Tex. 436, 61 S.W. 114 as follows:

"The legislative department of the state government may make any law not prohibited by the constitution of the state or that of the United States. Therefore the rule is that, in order for the courts to hold an act of the legislature unconstitutional, they must be able to point out the specific provision which inhibits the legislation. If the limitation be not express, then it should be clearly implied."

It follows that if there be no limitation found in the Constitution, the legislature would be fully empowered to create or authorize the creation of junior college districts and authorize them to levy an ad valorem tax.

The appellants do not dispute the rules above stated nor do they contend that the Constitution in so many words provides that the legislature shall not authorize a junior college district to levy an ad valorem tax. They do, however, say that the legislative power to authorize a local ad valorem tax for junior colleges is denied by clear implication.

There have been a number of briefs filed in this case by Amici Curiae, including one by the Attorney General. As opposed to appellants' theory of implied limitation, the briefs submit two theories: (1) that there is no provision of the Constitution which either expressly or impliedly prohibits the legislature from establishing a junior college district and authorizing it to levy an ad valorem tax, and (2) that the legislative power to authorize a junior college district to levy an ad valorem tax is supported by the provisions of Article 7, § 3 of the Constitution.

■ The majority of this Court is of the opinion that Article 2815h, § 7 should be held valid and enforceable under the second theory above mentioned.

The solution of the problem is not free of difficulty. Our school laws have been characterized as confused, vague and conflicting. Barber v. County Board of Trustees, Tex.Civ.App., 43 S.W.2d 319, no wr. hist., and lack of clarity is found in both constitutional and statutory enactments. Article 7, § 3 of the Constitution which is of importance here has been amended some six times since its adoption as a part of the Constitution of 1876. These amendments must be noticed in some detail in order to arrive at a proper understanding of the historical background of the case. A junior college district is here involved and while some state schools bearing a resemblance to the present day junior college were in existence prior to 1929, the regional junior colleges for the most part came into existence as a result of the passage of the Junior College Act. Acts 1929, 41st Leg., p. 648, ch. 290. See, Article 2815h, Vernon's Ann. Tex.Stats. for the 1929 Act and amendments thereto. The last amendment to Article 7, § 3 of the Constitution was adopted in 1926, so that the form of Article 7, § 3, as it existed after 1926, is of controlling importance here.

Some difficulty of classification has arisen with reference to junior colleges and the regional districts supporting them. Undoubtedly the framers of the Texas educational system envisioned a system of schools extending from those of an elementary grade to those of a university level, that is, elementary schools, secondary schools or high schools and colleges and universities. The junior colleges, developed for the most part since 1929, are sandwiched in, so to speak, between the high schools on one hand and the colleges or universities on the other hand. In certain respects, the junior college is what its name implies, that is, a school which is above the high school level yet one whose highest grade is below the educational level required for a degree from a university. Yet, as pointed out by one of the briefs on file here, it would not be inappropriate to refer to the districts which support such schools as "junior college districts," "advanced independent school districts" or "graduate high school districts." The point of this is that junior colleges and their districts may in some instances be regarded as colleges and in other instances as schools in the nature of advanced high schools. The Junior College Act itself makes numerous references to independent school districts when delineating the powers and operations of a junior college district.

The Texas junior college history bears some relation to the experience of other states with secondary schools, that is, high schools or college preparatory schools.

As above indicated, Article 7, § 3 of the Constitution is a rather patched up and overly cobbled enactment. In order to meet situations deemed undesirable by the people of Texas, which were pointed up by the decisions of this Court, amendments have been adopted which in turn led to further unwanted and perhaps unforeseen results. While one could wish for a clearer statement of fundamental law than that contained in the 1876 Constitution and the one hundred or so amendments thereto, we think the way to decision in this case may be made discernible by placing the constitutional provisions, the decisions of this Court and the pertinent legislative actions in their proper chronological order. As above indicated, we are not to decide this case upon the basis of the Constitution as it existed in 1876 but rather upon the Constitution as it existed in 1929 after numerous amendments had been adopted thereto.

Article 7, § 3 as it appeared originally in the Constitution of 1876 provided that:

"Sec. 3. There shall be set apart annually not more than one-fourth of the general revenue of the State, and a poll tax of one dollar on all male inhabitants in this State between the ages of twenty-one and sixty years, for the benefit of the public free schools."

This was the article of the Constitution under which the case of City of Fort Worth v. Davis, 57 Tex. 225 was decided in 1882. It should be noted that under the original Constitution, the Legislature was vested with plenary power to create or provide for the creation of school districts, or school communities as they were called at that time. 8 Gammel's Laws of the State of Texas 1035, Acts 1876, 15th Leg., Reg. Session, p. 199, ch. 120; State v. Brownson, 94 Tex. 436, 61 S.W. 114. It is inferable that during this period in the history of the development of the Texas educational system, schools within the cities and towns were administered for the most part by municipal authorities while the rural schools were controlled by the trustees of the "school communities."

As a result of the decision in Fort Worth v. Davis, the article was amended in 1883 to avoid the restrictive interpretation of that case insofar as the power of a school district to levy a maintenance tax was concerned. The article as amended read as follows:

"Sec. 3. One-fourth of the revenue derived from the state occupation taxes, and a poll tax of one dollar on every male inhabitant of this state, between

the ages of twenty-one and sixty years shall be set apart annually for the benefit of the public free schools, and, in addition thereto, there shall be levied and collected an annual ad valorem state tax of such an amount, not to exceed twenty cents on the one hundred dollars valuation, as, with the available school fund arising from all other sources, will be sufficient to maintain and support the public free schools of this state for a period of not less than six months in each year; and the Legislature may also provide for the formation of school districts within all or any of the counties of this state, by general or special law, without the local notice required in other cases of special legislation, and may authorize an additional annual ad valorem tax to be levied and collected within such school districts for the further maintenance of public free schools and the erection of school buildings therein; provided, that two-thirds of the qualified property taxpaying voters of the district, voting at an election to be held for that purpose, shall vote such tax, not to exceed in any one year twenty cents on the one hundred dollars valuation of the property subject to taxation in such district, but the limitation upon the amount of district tax herein authorized shall not apply to incorporated cities or towns constituting separate and independent school districts."

Because of the provision that the "Legislature may also provide for the formation of school districts within all or any of the counties of this state," this Court held that there was an implied restriction upon the power of the legislature to provide for the formation of school districts in that no district could be created embracing territory in more than one county. Parks v. West, 102 Tex. 11, 111 S.W. 726 (1908). In the case cited, this Court recognized the plenary power of the legislature over school districts and organizations and stated that the Court of Civil Appeals in its opinion (108 S.W. 466) "very correctly states the rule by which the power of the Legislature is to be tested when it says: 'The legislative department of a state government may make any law not prohibited by the Constitution of the state or that of the United States. Therefore, the rule is that in order for the courts to hold an act of the Legislature unconstitutional, they must be able to point out the specific provision which inhibits the legislation. If the limitation be not express, then it should be clearly implied.'" It was held however that from the inclusion of the words "all or any of the counties of this state" in the amendment it must be inferred that no district could be formed of territories lying within two or more counties. This decision had to do with the territorial extent of school districts. However, it precipitated a further amendment to the Constitution to overcome the limitation pronounced in Parks v. West. This amendment was adopted in 1909. Other amendments were adopted in 1908, 1918, 1920 and 1926 relating to such subjects as tax rates, poll taxes, and creation of school districts by special laws. See, Historical Note under Article 7, § 3, Vernon's Ann.Tex.Const. The amendments last mentioned have no particular bearing upon the problem at hand other than that they necessitated some rearrangement in wording. However, because of these amendments, particularly that of 1909, there is substantial difference not only in wording but in phrase arrangement between Article 7, § 3 as it existed in 1908 and as it exists today. There may seem some redundancy in the presently existing section relating to the assessment and collection of taxes. This, however, serves to emphasize that there now exists in the Constitution a separate and independent clause authorizing "all school districts heretofore formed or hereafter formed" to levy an ad valorem maintenance tax. In other words, the provisions as to the permissible territorial extent of districts and those relating to the taxing power of districts, "heretofore formed and

hereafter formed," have been definitely separated and were so separated in 1926 at the date of the last amendment to Article 7, § 3. The section as it existed in 1926 and exists today reads as follows (the italicized portions indicate the clauses relating to the taxing power of districts "heretofore formed and hereafter formed."):

"Sec. 3. One-fourth of the revenue derived from the State occupation taxes and poll tax of one dollar on every inhabitant of the State, between the ages of twenty-one and sixty years, shall be set apart annually for the benefit of the public free schools; and in addition thereto, there shall be levied and collected an annual ad valorem State tax of such an amount not to exceed thirty-five cents on the one hundred ($100.00) dollars valuation, as with the available school fund arising from all other sources, will be sufficient to maintain and support the public schools of this State for a period of not less than six months in each year, and it shall be the duty of the State Board of Education to set aside a sufficient amount out of the said tax to provide free text books for the use of children attending the public free schools of this State; provided, however, that should the limit of taxation herein named be insufficient the deficit may be met by appropriation from the general funds of the State and the Legislature may also provide for the formation of school district by general laws; and all such school districts may embrace parts of two or more counties, and the Legislature shall be authorized to pass laws for the assessment and collection of taxes in all said districts and for the management and control of the public school or schools of such districts, whether such districts are composed of territory wholly within a county or in parts of two or more counties, *and the Legislature may authorize an additional ad valorem tax*

*to be levied and collected within all school districts heretofore formed or hereafter formed, for the further maintenance of public free schools, and for the erection and equipment of school buildings therein;* provided that a majority of the qualified property taxpaying voters of the district voting at an election to be held for that purpose, shall vote such tax not to exceed in any one year one ($1.00) dollar on the one hundred dollars valuation of the property subject to taxation in such district, but the limitation upon the amount of school district tax herein authorized shall not apply to incorporated cities or towns constituting separate and independent school districts, nor to independent or common school districts created by general or special law."

It is argued by the Attorney General that the phrase "school districts heretofore formed or hereafter formed" used in connection with the tax authorization power is broad enough to include junior college districts created under and by virtue of the Junior College Act of 1929, Article 2815h, Vernon's Ann.Tex.Stats., and that it would be wholly untenable to say that the phrase which defines one of the two purposes for which taxes may be levied as being for "the further maintenance of public free schools" operated to exclude junior college districts and restrict the meaning of the clause to elementary and high school districts. In support of this view, it is pointed out in an amicus curiae brief filed herein that the final proviso of Article 7, § 3 should be given some meaning. This clause provides that "the limitation upon the amount of school district tax herein authorized shall not apply to incorporated cities or towns constituting separate and independent school districts, nor to independent or common school districts created by general or special law." It is urged that, "This exception clearly shows that Section 3 contemplates that there may be school districts of types other than the three types which

are excepted from the tax limitation." [2] It is further suggested that Article 7, § 3 does not define what is meant by the term "school district" or "public free school district," hence this matter is left to the determination of the legislature. From these considerations and circumstances it is concluded that a district created under the Junior College Act is a "school districts heretofore formed or hereafter formed" within the constitutional meaning of that term as used in the tax authorization clause of Article 7, § 3.

As opposed to the theory above set out, the appellants' points, as heretofore indicated, present the argument that (1) the Constitution impliedly prohibits the Legislature from authorizing a junior college district to levy an ad valorem tax for maintenance purposes and hence such tax is invalid unless expressly authorized by some constitutional provision, and that (2) Article 7, § 3 of the Constitution does not authorize the Legislature to empower a junior college district to levy an ad valorem tax for maintenance purposes.

As supporting their theory of an implied limitation upon the power of the legislature to authorize a junior college district to levy a maintenance tax, the appellants rely upon City of Fort Worth v. Davis (1882), 57 Tex. 225.[3] It may be and is argued with plausi-

---

2. The constitutional limitation is one dollar on the one hundred dollars valuation. The statutory limit in the Junior College Act is twenty cents upon the one hundred dollars of property valuation. Article 2815h, § 7.

3. It appears from the report of the Davis case that the City of Fort Worth had assumed control of its public free schools and sought to levy a tax under Article 3785 R.S. 1879, which provided that the City, upon proper vote of its taxpayers, could levy a tax on all property within the city to supplement the funds received from the State available fund for school purposes. The Court held that the tax levy provided for in Article 3785 was not supported by Article 7 of the Constitution, although it could be supported, insofar as the City of Fort Worth was concerned, by Article 11, § 10 of the Constitution relating to "Municipal Corporations." The tax however was held invalid because a properly worded proposition had not been submitted to a vote of the taxpayers.

In its discussion of the asserted power to levy a local tax to carry out the directions of Article 7, § 1 of the Constitution relating to education, the Court considered implied limitations upon the taxing power. The Court said:

"[T]he Article on education and public schools, * * * directs (that) 'not more than one-fourth of the general revenue of the State, and a poll tax of one dollar' be set aside annually for the benefit of the public free schools. It (the Article) defines the permanent available school funds thus: 'The principal of all bonds and other funds, and the principal arising from the sale of the lands hereinbefore set apart to said school fund, shall be the permanent school fund; and all the interest derivable therefrom, *and the taxes herein authorized and levied*, shall be the available school fund, which shall be applied annually to the support of the public free schools'. Clearly the expression 'taxes herein authorized' negatives all other taxation for school purposes than that expressly authorized in the constitution. So the 9th section of the article on taxation carefully prescribes the limit to state, county and city taxation, except for the payment of debts then already incurred, 'and except as in this constitution as otherwise provided.' These repeated and guarded constitutional limitations of the taxing power are a prominent feature of that instrument and, are inconsistent with the existence of a legislative power to authorize additional taxation by school districts, unless some affirmative grant of that power be found in the constitution itself."

Mention was made of Article 9, Section 7 of the Constitution of 1869, which read as follows:

"The Legislature shall, if necessary, in addition to the income derived from the public school fund, and from the taxes for school purposes provided for in the foregoing section (relating to the permanent school fund) provide for the raising of such amount by taxation, in the several school districts in the state, as will be necessary to provide the necessary school houses in such districts, and insure the education of all the scholastic inhabitants of the several districts."

It was pointed out that the framers of the Constitution of 1876 were familiar with the provision of the former Consti-

bility that this 1882 case can hardly be considered as authority for denying to the legislative branch the power to authorize a junior college district to levy a maintenance tax. However that may be, if we assume for present purposes that under the Constitution as it existed in 1882, no such tax could be authorized by the legislature, it does not follow that the tax could not

be supported under the constitutional provision as it existed in 1929, after Article 7, § 3 had been amended a number of times. Appellants argue, however, that despite these changes the implied constitutional prohibition upon the legislative power persists insofar as junior college districts are, concerned. It is said that a junior college district is not the type of district compre-

tution which authorized local taxation for school purposes and that this constitutional provision was omitted from the 1876 Constitution.

The reasoning of the Davis opinion as to a constitutional limitation of the taxing power is predicated upon the circumstance that the framers of the Constitution of 1876 envisioned that the public free schools of the state would be financed by state funds and not in part by local taxation as was done by the Constitution of 1869.

The basis of the Davis opinion is the wording of Article 7 of the 1876 Constitution as it existed before the amendment of 1883, Gammel's Laws of Texas 809, and the key words therein relied upon were "taxes herein authorized" which were contained in Article 7, § 5. It was held that because of the provisions for the support of *schools* contained in the Constitution, it was implied that there could be no taxes other than those "herein authorized," that is, provided for in Article 7.

It is contended that although Fort Worth v. Davis did not involve a junior college district, the case is nevertheless authority for the proposition that there is an implied constitutional prohibition against legislative authorization of a local ad valorem tax for the maintenance of a junior college. It is then asserted that while the 1883 amendment authorized the legislature to enable an elementary or high school district to levy a maintenance tax, it was wholly ineffective to authorize a similar tax for junior college districts.

At the time of the Constitutional Convention of 1875, junior colleges, as we know them today, were apparently unknown to the members of the convention. One whose reading of the journals of the 1875 Convention is interrupted by the parading of a modern high school band is forceably impressed with a change in the scope of public education and perhaps differences in educational concepts. The framers of the Constitution were talking of schools which would remain in session but four or five months of the year.

The state had just emerged from a period of gross governmental mismanagement and the excessiveness of local school tax levies under the Constitution of 1869 was a matter of bitter complaint.

Mr. Richard Sansom, a delegate from Williamson County to the Convention, stated that "he desired simply to say that the people wanted no taxes levied for the maintenance of public schools. He said he knew not one taxpayer in his entire county when he canvassed the county who expressed a wish to continue the public schools by taxation. He did not believe the people of Texas wanted to go one step in that direction. It was this school tax that the people had complained so much about. It was the main tax, the main expense, and burden, that induced them to call this Convention." McKay, Debates in the Texas Constitutional Convention of 1875, p. 219.

Various opinions were expressed, some were strongly opposed to "any system of public free schools supported by taxation." McKay p. 225. Others would provide public schools for indigents only. McKay p. 356. The proponents for free public schools were, however, both vigorous and eloquent. McKay, p. 220 et seq., and the principle of public education was written into the Constitution. A proposed amendment which would permit local taxation was proposed by delegate Charles DeMorse. McKay p. 214. This proposal was, however, rejected. Such decision was subsequently reversed by the 1883 amendment to the educational section of the Constitution.

Despite these expressions on the part of certain delegates, it can hardly be supposed that the prophetic vision of the convention was so circumscribed that its educational conception embraced only a static non-changing educational system based upon four-month schools of an elementary type. While the delegates may not have envisioned junior colleges, it does not follow that they contemplated neither development nor improvement in the Texas system of public education.

hended by the tax authorization provision of Constitutional Article 7, § 3. As their authority for this position they cite Williams v. White, Tex.Civ.App., 223 S.W.2d 278, wr. ref. in which an issue as to the permissible territorial extent of a junior college district was involved. In the Williams case, it was urged that because *all* of Real, Uvalde and Zavala counties were included within the Southwest Texas Joint County Junior College District, the district was not legally formed because of the provision of Article 7, § 3 of the Constitution which says that "such school districts may embrace parts of two or more counties." The implied limitation theory was then urged, i. e., that as the Constitution expressly said that *parts* of counties could be grouped, it impliedly prohibited the inclusion of entire counties to form a junior college district. This contention was answered by the Court of Civil Appeals in two ways: The Court pointed out that junior colleges were akin to institutions of higher learning and cited Mumme v. Marrs, 120 Tex. 383, 40 S.W.2d 31 wherein it was recognized that institutions of higher learning could be created by the legislature

without direct constitutional grant. It was also said that if junior college districts be considered in the same class as common and independent school districts, then "the proviso relating to 'parts of two or more counties' should not be construed as prohibiting the combination of entire counties into joint (junior college) districts." The portion of the decision in Williams v. White relied upon by the appellants does not relate to the taxing provision of Article 7, § 3 but rather to the grouping or inclusion of territories in forming the district and the resultant effect thereof upon the legality of the existence of the district. Appellants' argument is essentially that the clause of Article 7, § 3 relating to the territory that may be included within a school district is so closely related to the taxing clause that by analogy a holding that a junior college district is not circumscribed as to its formation by the territorial provisions of Article 7, § 3, should dictate the further holding that the district is not comprehended by the tax authorization clause of the article.

Appellants' argument does not rest entirely upon Williams v. White.[4] However,

4. It is somewhat unusual to find a case cited as authority for the denial of the taxing power which in the main upholds the validity of the formation of a junior college district and its power to tax. The same case is cited by appellees as authority for the proposition that the tax herein questioned is constitutionally authorized. Williams v. White, however, does not directly meet the contention raised by appellants here despite the fact that the trial court made rather broad findings and conclusions supporting both the legality of the district and its taxing power. (223 S.W.2d 281)

The holdings of an opinion necessarily must be construed in the light of the contentions made by the litigants. In Williams v. White the position of appellants in the Court of Civil Appeals was that the district was illegally formed in that three entire counties were included therein contrary to the implied prohibitions against the inclusion of entire counties contained in Article 7, § 3 of the Constitution, and hence the tax sought to be levied was illegal. In the present case the argument concedes the legal existence of the district

but asserts that because of an implied limitation and the lack of an express authorization, the legislature has no power to authorize a junior college district to levy an ad valorem tax. Specifically, in Williams v. White the taxing authority of the district was challenged upon the ground that the district had not been legally and constitutionally created (Points 1 and 3); that there was no *statutory* authority for the questioned tax levy, (Point No. 2) and that a county tax assessor and collector could not act as district assessor and collector of taxes levied against property located within one of the counties of the district. (Point No. 4)

It should perhaps be mentioned that certain of the briefs filed herein have construed the condensed and perhaps cryptic reference to an Attorney General's opinion contained in Williams v. White as being a reference to the 1927 opinion here discussed. The Attorney General's opinion referred to was one rendered in 1946 dealing specifically with Sections 7a, 7b and 22 of Article 2815h which, among other things, provide that a county assessor

what has been said fairly presents the contentions set forth in the brief. In summary, it is appellants' position that the constitutional phrase "all school districts heretofore formed or hereafter formed" does not embrace junior college districts.

As above pointed out, it is the position of the Attorney General that junior college districts are embraced within this phrase and hence the districts' taxing power for maintenance purposes rests upon a sound constitutional basis.[5]

We therefore have a squarely drawn issue presented for our decision.

It may be conceded that appellants' position is buttressed by plausible arguments, but we cannot say that the theory urged by the Attorney General in support of the constitutionality of the taxing section of the Junior College Act is clearly wrong. In this situation we must examine another well-recognized principle of constitutional law.

The construction placed upon the constitutional provision by the Attorney General will result in a holding that the taxing provision of the Junior College Act is valid and constitutional.[6] In Texas National Guard Armory Board v. McCraw, 132 Tex. 613, 126 S.W.2d 627 it was said with an abundant citation of authorities that:

"This Court has repeatedly held that no act of the Legislature will be declared unconstitutional unless some provision of the Constitution can be cited which clearly shows the invalidity of such act. Brown v. City of Galveston, 97 Tex. 1, 75 S.W. 488; 9 Tex.

Jur., sec. 59, pp. 477, 478, and cases cited in footnotes. The burden is on him who attacks a law for unconstitutionality and courts need not exert their ingenuity to find reasons for holding the law invalid. As was said by the Supreme Court of the United States in the case of Middleton v. Texas Power & Light Co., 249 U.S. 152, at page 157, 39 S.Ct. 227, at page 229, 63 L.Ed. 527: 'There is a strong presumption that a Legislature understands and correctly appreciates the needs of its own people, that its laws are directed to problems made manifest by experience, and that its discriminations are based upon adequate grounds.'

"If doubt should be raised as to the validity of a statute, such statute should be held valid unless it clearly violates some provision of the Constitution."

In Smith v. Patterson, 111 Tex. 535, 242 S.W. 749 it was held that no statute should be declared unconstitutional "unless it is absolutely necessary to so hold." This case is illustrative of the extent to which the courts will go in order to uphold the validity of a legislative enactment. The Act involved was the representative apportionment act of 1921. By a process of reasoning based upon population figures of which the Court took judicial notice, it was determined that the Legislature intended Swisher County to be a part of District No. 120 and the Act was thus upheld. In support of its decision the Court quoted the following applicable rules:

"In the case of Solon v. State, 54 Tex.Cr.R. [261] 272, 114 S.W. [349],

---

and collector of taxes may also collect taxes on behalf of a junior college district. (223 S.W.2d 282).

5. This is not the only argument relied upon to support the validity of the tax provision of the Junior College Act. As above indicated, appellees urge that there is no implication which can reasonably be drawn from a specific constitutional provision which would prohibit the legislature from

authorizing a junior college district to levy an ad valorem maintenance tax.

6. The authorities hereafter discussed also have some bearing upon the appellees' argument that there is no implied limitation upon the plenary power of the legislature over public education insofar as the authorizing of a local maintenance tax for junior colleges is concerned. See, Mumme v. Marrs, 120 Tex. 383, 40 S.W. 2d 31.

350, 352, in passing upon the constitutionality of a statute, the Court of Criminal Appeals, in an able opinion by Mr. Justice Ramsey (who afterwards was a member of this court), used the following language:

" 'The rule is universal that the courts will not declare an act of the Legislature unconstitutional, unless such infirmity and vice clearly appears. Indeed this rule is necessary, and evidences that respectful regard in which the judicial should hold the legislative department of our government.'

"Mr. Cooley, in his work on Constitutional Limitations, in discussing this subject, says:

" 'They (the courts) will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new light upon the subject, and never declare a statute void, unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt. A reasonable doubt must be solved in favor of the legislative action, and the act be sustained.'

"In the case of Koy v. Schneider, 110 Tex. 369, 218 S.W. 479, 221 S.W. 880, this court said:

" 'A statute will not be declared unconstitutional in a doubtful case. * * * Courts should uphold the statute as valid, unless clearly unconstitutional; every intendment and presumption being in favor of constitutionality.'

"We could quote many texts and many authorities, from our own state and other jurisdictions to the effect that the greatest liberality must be exercised in upholding the validity of a statute and in giving full faith and credit to the acts of the Legislature, a co-ordinate department of government. We are in hearty accord with these views, and would add our emphasis to them."

The rules above stated apply with particular force when it appears that the legislative and executive departments of government have acted upon an interpretation of the organic law and there has been general acquiescence in and reliance upon such interpretation. Constitutional questions are not decided in a vacuum wholly unaffected by the practicabilities of a situation. Administrative interpretations made under statutory authority which have been relied upon over the years have their proper place and weight in determining constitutional questions. In Mumme v. Marrs, 120 Tex. 383, 40 S.W.2d 31, (affirming Marrs v. Mumme, Tex.Civ.App., 25 S.W.2d 215), Chief Justice Cureton, writing for this Court, said:

"The universal rule of construction is that legislative and executive interpretations of the organic law, acquiesced in and long continued, as in the case before us, are of great weight in determining the validity of any act, *and in case of ambiguity or doubt will be followed by the courts, * *.*" (The emphasis is that of the late Chief Justice)

See also, San Antonio Union Junior College District v. Daniel, 146 Tex. 241, 206 S.W. 995.

Article 4399, Vernon's Ann.Tex.Stats. makes it the duty of the Attorney General to give written legal advice to various state departments and agencies, including the committees of either branch of the legislature. In 1927, prior to the passage of the Junior College Act, the legislative branch of government propounded the following inquiry to the Attorney General:

"Has the Legislature the constitutional authority to enact a law providing for one or more school districts or counties to organize a junior college district and vote a tax for the support of such junior college?"

The Attorney General relying upon Article 7, § 1 [7] and Article 3, § 48 [8] of the Constitution answered the question in the affirmative and held that it was the "right and duty of the Legislature to make such provision for such schools and junior colleges as the Legislature in its wisdom deems best."

From 1927 until the present time, this holding of the Attorney General has never been directly questioned in the appellate courts of this State.[9] As a consequence the junior college has become an integral part of the Texas educational system. The number of junior colleges has multiplied, Article 2815h, et seq., Vernon's Ann.Tex. Stats., and most of them depend upon the taxes authorized by Article 2815h, § 7.

The clause which provides that, "the Legislature may authorize an additional ad valorem tax to be levied and collected within all districts heretofore or hereafter formed, for the further maintenance of public free schools, and for the erection and equipment of school buildings therein; * * *" has been relied upon by the legislature in sanctioning the issue of junior college district bonds, Article 2815h, § 7. Numerous bond issues have been authorized by the qualified voters of the various junior colleges of this state and approved as to legality by the Attorneys General who have served the State since 1929.

Under these circumstances, we are confronted with a stronger doctrine than that arising from the decent respect which one branch of government should have for the actions of another. General public acceptance of and acquiescence in a certain construction of a constitution extending over a long period of time, particularly when occasions for the questioning of such construction have arisen repeatedly, gives rise to a doctrine that affords to such acceptance a persuasiveness akin to precedent. With the sale of every bond issue and the collection of each tax levied, an opportunity was presented to challenge the constitutional tax basis of the junior college districts. For years no such attack was made with the result that the junior colleges became an essential and desirable element in the Texas scheme of public education. Any impairment in the efficiency of their functions and service capacities at the present time could lead only to undesirable results from the standpoint of the citizenry as a whole. While this public acquiescence could not result in a precedent in the judicial sense,[10] yet,

7. "A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools." Constitution, Article 7, § 1.

8. "The Legislature shall not have the right to levy taxes or impose burdens upon the people, except to raise revenue sufficient for the economical administration of the government, in which may be included the following purposes: * * *
"The support of public schools, in which shall be included colleges and universities established by the State; and the maintenance and support of the Agricultural and Mechanical College of Texas. * * *" Constitution, Article 3, § 48.

9. As above pointed out the attack made upon the taxing power of the Southwest Texas Joint County Junior College District in Williams v. White, Tex.Civ.App., 223 S.W.2d 278, wr. ref., was based upon the contention that the District had no legal existence. It was not asserted in the appellate court that a legally created junior college district was without power to levy a maintenance tax.

10. The operation of judicial precedent is such that the provisions of a constitution do not always control its meaning. In Morrow v. Corbin, 122 Tex. 553, 62 S.W. 2d 641, the constitutionality of the certified question practice involving the Courts of Civil Appeals and the Supreme Court was upheld because it had been exercised for some forty years. This, although the constitutional basis for the practice could not be pointed out and was characterized by the Court as being "elusive". (62 S.W.2d 651)

this general acceptance does carry with it a persuasiveness of compelling force. Where, as hereinabove pointed out, there is a tenable theory supporting the questioned legislative power, the taxing provisions of the Junior College Act should be upheld.

The philosophy and reasoning contained in the opinion rendered in Stuart v. School District No. 1 of the Village of Kalamazoo, 30 Mich. 69, is persuasive here. In an opinion written by Mr. Justice Thomas M. Cooley, the author of "Cooley's Constitutional Limitations," the Michigan Supreme Court upheld the legality of a tax levied by the Kalamazoo School District for the support of secondary schools. This is a landmark case in the history of school law development and is particularly applicable here in that the position of high schools in the 1870s was somewhat similar to that of the regional junior colleges as developed in this state from 1930 to 1950. The public high school evolved to meet a public need when in the course of American growth and economic development it became necessary and desirable that the average educational level be raised above that of the elementary schools. Junior colleges came into being to fulfill a similar need which became apparent in the twentieth century.

The complainants in Stuart v. School District sought to enjoin the collection of taxes levied against their property. Among other contentions it was urged that the district was not authorized to levy a tax for the support of high schools because the provisions of the state constitution had not been followed in adopting the legislation which purported to authorize the tax. The Supreme Court, in discussing this contention, likened an attack upon the taxing power to an attack upon the legal existence of this district itself. The Court, in commenting upon the lapse of time between the commencement of the exercise of the taxing power and the filing of the suit which sought the destruction of that power, drew an analogy between a limitation statute applicable to attacks upon the legal existence of school districts and applied the principle or reasoning supporting such statute to the assault upon the district's taxing power. We quote from the opinion:

"Whether this particular objection (that the statute authorizing the tax had not been constitutionally adopted) would have been worthy of serious consideration had it been made sooner, we must, after this lapse of time, wholly decline to consider. This district existed de facto, and we suppose de jure, also, for we are not informed to the contrary, when the legislation of 1859 was had, and from that time to the present it has assumed to possess and exercise all the franchises which are now brought in question, and there has since been a steady concurrence of action on the part of its people in the election of officers, in the levy of large taxes, and in the employment of teachers for the support of a high school. The state has acquiesced in this assumption of authority,[11] and it has never, so far as we are advised, been questioned by any one until, after thirteen years user, three individual tax payers, out of some thousands, in a suit instituted on their own behalf, and to which the public authorities give no countenance, come forward in this collateral manner and ask us to annul the franchises. To require a municipal corporation, after so long an acquiescence, to defend, in a merely private suit, the irregularity, not only of its

11. While appellants have not attacked the legal existence of the San Jacinto Junior College District, it should perhaps be pointed out in connection with the opinion in Stuart v. School District, that the Texas Legislature insofar as it is legally possible to do so, has repeatedly validated the legal existence of the district, its bonds and its right to levy taxes. See, sections following Articles 2815g and 2815h of Vernon's Ann.Tex.Stats.

own action, but even of the legislation that permitted such action to be had, could not be justified by the principles of law, much less by those of public policy. We may justly take cognizance in these cases, of the notorious fact that municipal action is often exceedingly informal and irregular, when, after all, no wrong or illegality has been intended, and the real purpose of the law has been had in view and been accomplished; so that it may be said the spirit of the law has been kept while the letter has been disregarded. We may also find in the statutes many instances of careless legislation, under which municipalities have acted for many years, until important interests have sprung up, which might be crippled or destroyed, if then for the first time matters of form in legislative action were suffered to be questioned. If every municipality must be subject to be called into court at any time to defend its original organization and its franchises at the will of any dissatisfied citizen who may feel disposed to question them, and subject to dissolution, perhaps, or to be crippled in authority and powers if defects appear, however complete and formal may have been the recognition of its rights and privileges, on the part alike of the state and of its citizens, it may very justly be said that few of our municipalities can be entirely certain of the ground they stand upon, and that any single person, however honestly inclined, if disposed to be litigious, or over technical and precise, may have it in his power in many cases to cause infinite trouble, embarrassment and mischief.

"It was remarked by Mr. Justice Campbell in People v. Maynard, 15 Mich. [463] 470, that 'in public affairs where the people have organized themselves under color of law into the ordinary municipal bodies, and have gone on year after year raising taxes, making improvements, and exercising their usual franchises, their rights are properly regarded as depending quite as much on the acquiescence as on the regularity of their origin, and no ex post facto inquiry can be permitted to undo their corporate existence. Whatever may be the rights of the individuals before such general acquiescence, the corporate standing of the community can no longer be open to question.' To this doctrine were cited Rumsey v. People, 19 N.Y. 41, and Lanning v. Carpenter, 20 N.Y. 447. The cases of State v. Bunker, 59 Me. 366; People [ex rel. Attorney General] v. Salomon, 54 Ill. [39] 41, and People [ex rel. Attorney General] v. Lothrop, 24 Mich. 235, are in the same direction. The legislature has recognized this principle with special reference to school districts, and has not only deemed it important that their power should not be questioned after any considerable lapse of time, but has even established what is in effect a very short act of limitation for the purpose in declaring that 'Every school district shall, in all cases, be presumed to have been legally organized, when it shall have exercised the franchises and privileges of a district for the term of two years'; Comp. L.1871, § 3591. This is wise legislation, and short as the period is, we have held that even a less period is sufficient to justify us in refusing to interfere except on the application of the state itself: [Fractional] School District [No. 1] v. Joint Board, etc., 27 Mich. 3.

"It may be said that this doctrine is not applicable to this case because here the corporate organization is not questioned, but only the authority which the district asserts to establish a high school and levy taxes therefor. But we think that, though the statute may not in terms apply, in principle it is strictly applicable. The district claims and has long exercised powers which take it out of the class of ordinary school

districts, and place it in another class altogether, whose organization is greatly different and whose authority is much greater. So far as the externals of corporate action are concerned, the two classes are quite distinct, and the one subserves purposes of a higher order than the other, and is permitted to levy much greater burdens. It is not very clear that the case is not strictly within the law; for the organization here claimed is that of a union school district, and nothing else, and it seems little less than an absurdity to say it may be presumed from its user of corporate power to be a school district, but not such a district as the user indicates, and as it has for so long a period claimed to be. But however that may be, we are clear that even if we might be allowed by the law to listen to the objection after the two years, we cannot in reason consent to do so after thirteen. It cannot be permitted that communities can be suffered to be annoyed, embarrassed and unsettled by having agitated in the courts after such a lapse of time questions which every consideration of fairness to the people concerned and of public policy require should be raised and disposed of immediately or never raised at all."

The judgment of the trial court is affirmed.

CALVERT, C. J., and WALKER, J., dissenting.

GRIFFIN, Justice (concurring).

Generally I am in agreement with the majority opinion. However, I have a little different approach to this problem and I will set forth the reasons why I think the right to tax for the benefit of junior colleges should be sustained.

It seems to me that the first question which requires decision is whether or not the Legislature has the power, under our Constitution, to legally create a junior college district. In my opinion, the Legislature has such power.

There is no mention eo nominee of junior colleges in the Constitution. What is more important is that there is no specific prohibition in the Constitution which prevents the creation of various junior college districts.

Art. III, § 48, prohibits the Legislature from levying taxes and imposing burdens upon the people, except to raise revenue sufficient for the economical administration of the government, in which may be included the following purposes: The support of public schools, in which shall be included colleges and universities established by the state.

"The history of educational legislation in this state shows that the provisions of article 7, the educational article of the Constitution, have never been regarded as limitations by implication on the general power of the Legislature to pass laws upon the subject of education. This article discloses a well-considered purpose on the part of those who framed it to bring about the establishment and maintenance of a comprehensive system of public education, consisting of a general public free school system and a system of higher education. Three institutions of higher learning were expressly provided for. Constitution, article 7, §§ 10 to 15. These express requirements of the Constitution have been met by the creation and maintenance of the University of Texas, the Agricultural and Mechanical College, and the Prairie View Normal. The Legislature, however, has gone far beyond the creation of the three institutions of higher learning specifically required by the organic law, and has created ten additional institutions of similar character without direct constitutional grant, beginning with the Sam Houston Normal at Huntsville in 1879. Marrs' Texas School Laws (Ed. 1929). In founding

these ten institutions, beginning more than fifty years ago, the Legislature has necessarily held that the specific grants of power contained in the Constitution to erect and maintain the University of Texas, the A. & M. College, and Prairie View Normal were not limitations on its power to create other schools of similar purpose, and to maintain them by appropriations from the general revenue. This interpretation has never been questioned, and is consistent with authorities from other jurisdictions." (Citing authorities). Mumme v. Marrs, 120 Tex. 383, 40 S.W.2d 31, 1. c. 1st col. p. 33.

"[3] That the enumeration in the Constitution of what the Legislature may or shall do in providing a system of education is not to be regarded as a limitation on the general power of the Legislature to pass laws on the subject is shown by the decision of the Court of Appeals in Ex parte Cooper, 3 Tex.App. page 489, 30 Am.Rep. 152, as well as by the history of legislation touching the subject of education." idem 1. c. 2d col. p. 33.

"[4] This case is clearly authority for the proposition that, in ascertaining the power which the Legislature may constitutionally exercise with reference to the school system, we are not to limit or restrict that power, *including the power to assign revenue derived from sources other than those specifically named, to the school fund*, unless we find in the Constitution itself a specific limitation, or one which arises by necessary implication from the language used."

The Court then quotes all of Art. VII, § 1:

"A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools."

The Court then said:

"The purpose of this section as written was not only to recognize the inherent power in the Legislature to establish an educational system for the state, but also to make it the mandatory duty of that department to do so." Citing authorities, 1. c. bottom 2nd col. p. 35.

All emphasis herein has been added by me, except where otherwise indicated.

I believe the above authorities clearly prove that the Legislature has the Constitutional power to create junior colleges and junior college districts.

The next question is: Does the Legislature have Constitutional authority to provide in the Act creating a junior college district that by a majority vote of the qualified voters in said district a maintenance tax may be levied and collected for the support of a junior college so created? The answer to this is also "yes."

Appellants say that no such power exists and cite certain provisions of the Constitution which they say impliedly prohibit such action. Appellants have pointed to no provision of the Constitution *specifically prohibiting* such action on the part of the Legislature, but contend there is an *implied prohibition* against the Legislature giving the junior college district the right, upon a proper majority vote, to levy and collect a maintenance tax within the limits set by the Legislature in Art. 2815h, § 7 (The general Law providing for the creation of junior college districts).

In my opinion the Appellants approach the problem from the wrong point of view. Appellants contend that those provisions of the Constitution which prohibit the state, cities, and towns from making an assessment, levy and collection of taxes in excess, also prohibits a junior college district from

exercising any taxing power in excess of such provisions. I take it that the creation and operation of a junior college will be conceded by all to be a public and governmental function placed on the Legislature by our Constitution.

To construe the Constitution and Art. 2815h as not only permitting, but requiring the establishment of junior colleges, but to say these districts have no powers of taxation so as to operate, is to give the Constitution a strained and unreasonable construction.

"In the construction of Constitutions, as well as of statutes, it has been often held that the powers necessary to the exercise of a power clearly granted will be implied." This rule was referred to in Texas Central Ry. Co. v. Bowman, 97 Tex. 417, 79 S.W. 295, 2d col. p. 297.

"Where a general power is conferred, every particular power necessary for the exercise of same is also conferred, whether expressly granted or not. This is the rule laid down in Cooley's Constitutional Limitations (8th Ed.) vol. 1, page 138." First National Bank of Port Arthur v. City of Port Arthur (Tex.Civ.App.1931), 35 S.W.2d 258 (7, 8), no writ history; Baugham v. Willacy County Water Control & Imp. Dist, No. 1, et al. (Tex.Civ.App.1938), 112 S.W.2d 318, 321, (4, 5) writ refused.

"In spite of this (the duty of the Judiciary to determine whether a law is unconstitutional), a statute is presumed to be constitutional, and *every reasonable doubt as to the validity of an Act must be resolved in its favor.*" (Emphasis added). Friedman v. American Surety Co. of New York (1941) 137 Tex. 149, 151 S.W.2d 570, bot. 2nd col. 580; Tex. Nat'l. Guard Armory Board v. McCraw (1939) 132 Tex. 613, 126 S.W.2d 627(9–12); Dendy v. Wilson (1944) 142 Tex. 460, 179 S.W.2d 269 (12–14), 151 A.L.R. 1217; Duncan v. Gabler (1949) 147 Tex. 229, 215 S.W.

2d 155(1–5); Smith v. Decker (1958) 158 Tex. 416, 312 S.W.2d 632(3).

Since we have been cited to no provision of the Constitution specifically prohibiting the Legislature from authorizing a junior college district to levy and collect a maintenance tax within the limits prescribed, and since I have been unable to find such provision, I would adhere to the above well established rules of construction and uphold the power of the Legislature to provide for the maintenance tax.

In Friedman v. American Surety Co. of N. Y. (1941) 137 Tex. 149, 151 S.W.2d 570, the contribution required from the employer under the Unemployment Compensation Act was sustained as against the attack that the Legislature had no power to levy this tax (the case holds the contributions were taxes). Among the attacks made was the one that the Act necessarily violated the implied provisions of the Constitution which forbids the Legislature to delegate its powers to any other body, board or bureau. In sustaining the Act, the Court said:

"As already shown, this is a taxing statute. *The power to tax is inherent in sovereignty. Unless the tax here levied is prohibited by some other provision of our Constitution,* or some provision of the Federal Constitution, it could not violate Section 19 of Article I of our State Constitution.

"[11, 12] Section 48 of Article III of our Constitution provides that the Legislature shall not have the right to levy taxes or impose burdens upon the people, except to raise revenue sufficient for the economical administration of the Government. It is then provided that certain named purposes may be included in the power to levy taxes and impose burdens. *Of course the naming of such particular purposes would not exclude other proper governmental purposes.* The effect of this constitutional provision is to prohibit the Legislature from levying taxes or imposing burdens

for purposes other than to administer the Government. *If a tax cannot be classed as a tax to administer the Government it is unconstitutional, unless it is authorized by some other constitutional provision.* The administering of Government, however, covers and embraces a very large field of action. To our minds, this Act is not antagonistic to this constitutional provision. It certainly serves a public purpose. If it does so, and does not violate some other constitutional provision, it does not violate this provision."

If that tax could be sustained when unemployment compensation or a tax to support it is not even mentioned in the Constitution, how can it be said that a tax to carry out the specific mandate of Art. III, § 48 of the Constitution that the Legislature may levy taxes for "the support of public schools, in which shall be included colleges and universities established by the State" is invalid and beyond the power of the Legislature to enact. I cannot agree that such holding should be made by this Court. The power to tax being inherent in sovereignty; the Legislature having the power to levy taxes or impose burdens for the purpose of administering the government; the establishment of an educational system being expressly required of the Legislature and this power being excepted from the prohibition of the Legislature to tax (Art. 3, § 48 of the Constitution); there being no provision in the Constitution limiting the amount of taxes that can be levied by a junior college district, then it must necessarily follow that Sec. 7 of Art. 2815h, authorizing a junior college district to levy a maintenance tax within certain limits, must be upheld.

It will be noticed that the Unemployment Compensation Act does not levy the tax on every citizen of the state. Therefore, it is not a state tax, and the Friedman case so holds, 151 S.W.2d 578(15). Our junior college tax is also a levy only on a part of the citizens and property of the state, therefore it is not a state tax.

The mistake of appellants is that they consider the various constitutional provisions limiting the state ad valorem tax, the tax that may be levied by a public free school district, by cities, counties and municipalities, as constituting the source of the constitutional power of taxation. The true reasoning is that these provisions are the limiting of the inherent sovereign power to tax, not creation of the taxing power as appellant contends. The Legislature has had the power to tax solely within their discretion, except as *limited* by the Constitution. To limit this inherent power, the people imposed the various limitations found in the Constitution. This action put a ceiling on the exercise by the Legislature of their inherent taxing power.

Again, the constitutional provisions relied upon by appellant have to do with *state* taxes, not with junior college district taxes. Junior college district taxes are not *state* taxes. The tax levied applies only to the district, not *statewide*.

In the case at bar, the Legislature in 1927 asked the Attorney General whether or not the Legislature had the constitutional authority to enact a law providing for one or more school districts or one or more counties to organize a junior college district and vote a district tax for the support of such junior college. In a departmental opinion the then Attorney General under date of February 14, 1927, answered the question in the affirmative. In 1929 the Legislature enacted a general law of statewide application providing the conditions under which junior colleges could be formed, and providing that a maintenance tax for the support of such colleges might be levied upon the taxable property in the district by a majority vote of the duly qualified electors. Under this legislative enactment some thirty-three junior colleges have been established, and taxes voted to support and maintain them. They serve approximately 38,000 students. In the basic act certain duties are imposed upon the State Department of Education with reference to making a survey of the pro-

posed junior college district and its needs for a junior college. This board is an agency of the executive department of our state government. Certain other duties are also placed upon the Board of Education in regard to the establishment and operation of junior colleges created under the act

The junior colleges created under this act have issued bonds for the construction and equipment of the physical plants in which these colleges operate. It has been the duty of the various Attorneys General of the State of Texas to approve these bond issues. These bonds have been issued and marketed and I am sure many of them are owned by the permanent school fund of this state as well as by the members of the public. We know that prior to the successful marketing of these bonds, it has been necessary that their legality, validity and binding effect be approved by various capable and learned attorneys specializing in municipal bond issues. Each and every bond issue was required to be supported by a proper tax levy sufficient to pay the principal and interest on such issue. All such issues until the filing of the present suit have been approved by both the Attorneys General and private practitioners.

Until 1941 these junior college districts were supported wholly by maintenance taxes voted by a majority of the resident voters in each junior college district. In 1941, the Legislature made the first general appropriation bill for the support of the junior colleges created under the basic act (Art. 2815h, et seq. R.C.S.). Each succeeding Legislature has made a like appropriation from the State General Fund to "supplement local funds in the proper support, maintenance, operation and improvement of the public junior colleges of Texas." These appropriations have been made on the basis of so much money per capita on the enrolled students in each junior college.

For the past thirty-three years our Legislature has recognized the constitutional mandate by continuously enacting measures pertaining to the creation of junior college districts, their support and maintenance. The State Board of Education and the Central Education Agency who have control and supervision over all junior college districts, and the Attorney General of this State consistently have approved and executed these laws. For thirty-three years the legislative and executive branches of our state government have construed our Constitution as containing no restraint upon the power of the Legislature to do the things complained of in this case.

"As has been shown, the Legislature since 1915 has consistently construed the Constitution as permitting the enactment of rural aid measures, and the executive department has approved and executed these laws. The universal rule of construction is that legislative and executive interpretations of the organic law, acquiesced in and long continued, as in the case before us, are of great weight in determining the validity of any act, and in case of ambiguity or doubt will be followed by the courts. 9 Texas Jurisprudence, p. 439, § 27; 6 Ruling Case Law, p. 62, §§ 59, 60, 61, 62; Cox v. Robison, 105 Tex. 426, 439, 150 S.W. 1149; Gulf, C. & S. F. Ry. Co. v. [City of] Dallas (Tex.Com.App.) 16 S.W.(2d) 292, 294; Greene v. Robison, 117 Tex. 516, 535, 8 S.W.2d 655; Theisen v. Robison, 117 Tex. 489, 8 S.W.2d 646; Walker v. Meyers, 114 Tex. 225, 266 S.W. 499; Kimbrough v. Barnett, 93 Tex. 301, 55 S.W. 120." Mumme v. Marrs (1931), 120 Tex. 383, 40 S.W. 2d 31, 35.

I feel that the following quotation from the Supreme Court of Pennsylvania, Wilson v. School Dist. of Philadelphia, 328 Pa. 225, 195 A. 90, 113 A.L.R. 1401, 1412, 2d col., is apropos to our case:

"* * * [W]here a statute has been in force for many years without any question as to its constitutionality be-

ing raised and engagements have been entered into on the strength of its validity, the court will not undertake the drastic measure of wiping it off the statute books unless it is convinced beyond all peradventure of doubt that it violates a provision of the fundamental law."

Appellants contend that the fact that the Legislature has submitted many constitutional amendments authorizing creation of special districts is proof that the Legislature thought they did not have the power to create special districts and authorize them to levy taxes. A similar argument was made to this court against the constitutionality of the Unemployment Compensation Act in the Friedman case, supra. This court refused to give weight to this argument and said:

"We [will] say, however, that the history of the submission of constitutional amendments in this State will prove that not all of them have been submitted in order to create a legislative power. Some few have undoubtedly been submitted to ascertain the will of the people, and to enable them to express such will regarding a governmental policy." 151 S.W.2d 580 (17).

In applying the above discussed rules of construction and keeping in mind that there must be some constitutional provisions pointed out, which the taxing statute in question violates either expressly or by necessary implication (Vincent v. State (1921) Comm.App., 235 S.W. 1084, 1087–1088; Allen v. Channelview Ind. School District (Tex.Civ.App.1961), 347 S.W.2d 27, writ refused), and since no such provision has been pointed out, I agree with the majority opinion affirming the trial court's judgment upholding the tax.

CALVERT, Chief Justice (dissenting).

It is cases such as this that make a judge wish, for the moment at least, that ours were courts of men and not of law; that make a judge wish—if I may borrow language from the majority opinion—that he could lay aside what he regards as sound principles of law and decide the case on "the practicabilities of a situation." But intellectual integrity ought to be the individual judge's most compelling force; and when in his honest judgment sound rules of law are sacrificed to practicability and expediency, failure to protest is dereliction of duty.

In Williams v. White, 223 S.W.2d 278, June, 1949, the Court of Civil Appeals at San Antonio held that a junior college district was *not* a public school district within the meaning of Sec. 3, Art. VII of the Constitution. There is no mistaking that holding; it is in language too simple to be misunderstood. With the holding clearly challenged by application for writ of error and with the issue squarely drawn by the answer thereto, we "refused" the application and thus made the holding as authoritative as if we had made it ourselves. Rule 483, Texas Rules of Civil Procedure. Today, just thirteen and one-half years later, without overruling Williams v. White, we hold that a junior college district *is* a public school district within the meaning of Sec. 3, Art. VII of the Constitution. The language of the section has not been changed meanwhile. Aside from the obvious inconsistency of the two holdings which no subtlety of reasoning can explain away, I suggest that by all sound rules and standards of judicial approach to constitutional construction our holding in Williams v. White was right and our holding in this case is erroneous. I shall have more to say of Williams v. White later in this opinion.

The only issue directly presented in this case is the constitutionality of that part of Art. 2815h which empowers Union Junior College Districts to levy and collect ad valorem taxes for the support and maintenance of junior colleges. The majority opinion, the concurring opinion and the many briefs furnished the court make clear, however, that decision of that issue will

have far-reaching and controlling effect on many other questions not directly presented. It is important for that reason that the range of our decision comprehend and anticipate the results which must flow inevitably from our holding on the immediate question.

One may not logically dissent from a decision that the legislative effort to confer ad valorem taxing power on junior college districts is constitutional without examining and rejecting all theories seriously presented as bases for the decision. The theory presented by appellee, San Jacinto Junior College District, is that Sec. 1, Art. VII and Sec. 48, Art. III of the Constitution confer authority to levy ad valorem taxes for the support and maintenance of junior colleges *on the Legislature* and the Legislature may validly delegate the power to junior college districts. The theory presented by the concurring opinion is that the Legislature has inherent power to create junior college districts and clothe them with ad valorem taxing authority, which inherent power is somehow augmented by Sec. 48, Art. III of the Constitution. The theory of the majority opinion is that legislative power to create junior college districts with ad valorem taxing authority is derived from Sec. 3, Art. VII of the Constitution. Strangely enough, none of the proponents of the three theories embraces the theories of the other two, and the appellee, directly involved, expressly disavows the theory embraced by the majority.

At the outset it should be stated that I accept the postulate that a state constitution is not a grant of power to a legislature but is a limitation on its power, and that the power of a legislature is limited only by constitutional prohibition. Watts v. Mann, Tex.Civ.App., 187 S.W.2d 917, writ refused. I also accept as sound the rule that a statute is presumed to be constitutional and will not be declared unconstitutional unless its unconstitutionality is clear. Texas National Guard Armory Board v. McCraw, 132 Tex. 613, 126 S.W.2d 627. But those acceptances do not lead me to a conclusion that the statute is constitutional.

### Legislative Construction and Long Public Acquiescence

Before examining the various theories for upholding the constitutionality of the statute in question, notice should be taken of the strong reliance of the majority and concurring opinions on legislative construction of the Constitution and long public acquiescence in the impositions of the statute. Neither is a rule of construction; they are only weight factors which are of controlling force when, after applying sound rules of construction, the true intent and meaning of the Constitution remains doubtful. Neither legislative construction nor long public acquiescence therein can confer on a legislature a power which is denied to it, expressly or by necessary implication, by the Constitution.

It should be said at this point that legislative construction affords no basis for the theory of the majority. There is no evidence before us, or anywhere else as far as I am informed, that the Legislature or any other governmental agency has ever construed Sec. 3, Art. VII of the Constitution as empowering the Legislature to authorize junior college districts to levy ad valorem taxes. The statement in the majority opinion that the Legislature has relied on a clause of Sec. 3, Art. VII in "sanctioning the issue of junior college district bonds" has absolutely no foundation in this record or elsewhere. On the contrary, the record discloses quite clearly that the Legislature has acted pursuant to an opinion of the Attorney General, given to it in 1927, that the power is conferred by Sec. 1, Art. VII and Sec. 48, Art. III of the Constitution. Careful research demonstrates that the opinion is clearly erroneous. No doubt this evident fact accounts for the shift of the present Attorney General and a number of bond attorneys to Sec. 3, Art. VII as the source of the Legislature's power.

The majority opinion lays greater stress on long public acquiescence in legislative

exercise of power as a controlling factor than it does on initial legislative construction. Long public acquiescence and acceptance is likened to judicial precedent. In support of that approach the opinion quotes at great length from the opinion of Mr. Justice Thomas M. Cooley in Stuart v. School District No. 1 of Kalamazoo, 30 Mich. 69. Even a cursory reading of the opinion discloses that the case did not involve a constitutional question of legislative power to enact a statute. Validity of a tax levy was challenged as "invalid for want of compliance with the constitution *in the forms of enactment*" of a special statute passed by the Legislature for the school district's benefit and because the district had not strictly complied with the provisions of a general statute. The quotation in the majority opinion makes quite clear that Justice Cooley was saying only that *irregularities* in the enactment of statutes and in the formation of municipal corporations may not be challenged after long public acquiescence and acceptance. He said that neither principles of law nor public policy should require a municipal corporation, after thirteen years, to defend *"the irregularity"* of its action; that important interests which have sprung up might be crippled or destroyed if after long acquiescence "for the first time *matters of form* were suffered to be questioned."

Justice Cooley was of a diametrically opposite conviction concerning long public acceptance of a statute which the legislature had no constitutional power to enact. His views on this subject are also clear and positive. In his great work on Constitutional Limitations, 8th Ed., Vol. 1, p. 150, he wrote:

"Acquiescence for no length of time can legalize a clear usurpation[1] of power, where the people have plainly expressed their will in the Constitution, and appointed judicial tribunals to enforce it. A power is frequently

yielded to merely because it is claimed, and it may be exercised for a long period, in violation of the constitutional prohibition, without the mischief which the Constitution was designed to guard against appearing, or without anyone being sufficiently interested in the subject to raise the question; but these circumstances cannot be allowed to sanction a clear infraction of the Constitution. We think we allow to contemporary and practical construction its full legitimate force when we suffer it, where it is clear and uniform, to solve in its own favor the doubts which arise on reading the instrument to be construed."

In a footnote on p. 150 of Vol. 1 of his text, Mr. Cooley gives examples of judicial approval of unconstitutional usurpations[1] of power by legislatures. When we are exhorted to let our decisions of constitutional questions be affected "by the practicabilities of a situation," I can find comfort in resisting the exhortation in Cooley's comments on those cases. He said:

"These cases certainly presented very strong motives for declaring the law to be what it was not; but it would have been interesting and useful if either of these learned courts had enumerated the evils that must be placed in the opposite scale when the question is whether a constitutional rule shall be disregarded; not the least of which is, the encouragement of a disposition on the part of legislative bodies to set aside constitutional restrictions, in the belief that, if the unconstitutional law can once be put in force, and large interests enlisted under it, the courts will not venture to declare it void, but will submit to the usurpation,[1] no matter how gross and daring. We agree with the Supreme Court of Indiana, that, in construing constitutions, courts have nothing to do with the argument

---

1. It is not suggested that the Legislature "usurped" power in the enactment of

Art. 2815h. It acted only after obtaining the advice of the Attorney General.

*ab inconvenienti,* and should not "bend the Constitution to suit the law of the hour": Greencastle Township v. Black, 5 Ind. 557, 565; \* \* \*"

Heretofore the courts of this state have agreed with Justice Cooley. In the famous "chicken salad" case, Terrell v. Middleton, Tex.Civ.App., 187 S.W. 367, writ refused, the court declared unconstitutional an appropriation to pay certain mansion expenses of the Governor; and in rejecting an appeal to hold otherwise because the power to make such appropriations had been exercised by the Legislature for approximately forty years, the court said (187 S.W. 373–374):

> "A wrong cannot be sanctioned by age and acquiescence, and transformed into a virtue. Indifference and lack of vigilance have lost some of the dearest rights to the people, but they can always be regained by energy and persistence. \* \* \*
>
> "The will of a sovereign people as expressed through their organic law is supreme, and necessity, legislative construction, and legislative act cannot weaken, impair or destroy it."

*Basic Rules of Constitutional Construction*

No basic rules of constitutional construction are recognized in either the majority or the concurring opinion. Such rules exist. Moreover, only by their use can we discover whether a particular power is denied to a legislature and whether an amendment to the Constitution authorizes the exercise by a legislature of a particular power.

This court has said that "The fundamental rule for the government of courts in the interpretation or construction of a Constitution is *to give effect to the intent of the people who adopted it,*" and that *"The meaning of a Constitution is fixed when it is adopted; and it is not different at any subsequent time when a court has occasion to pass upon it."* Cox v. Robison, 105 Tex. 426, 150 S.W. 1149, 1151. We

have further stated that "Constitutional provisions, like statutes, are properly to be interpreted in the light of conditions existing at the time of their adoption, the general spirit of the times, and the prevailing sentiments of the people." Mumme v. Marrs, 120 Tex. 383, 40 S.W.2d 31, 35.

The fundamental rule for construing constitutional amendments is not greatly different. In Markowsky v. Newman, 134 Tex. 440, 136 S.W.2d 808, 813, we put it in these words:

> "In construing that [an] amendment the language used therein must be presumed to have been carefully selected and the words used are to be interpreted *as the people generally understood them.* Another rule of construction is generally, it may be said, that in determining the meaning, intent and purpose of a constitutional provision the history of the times out of which it grew and to which it may be rationally supposed to have direct relationship, the evils intended to be remedied and the good to be accomplished, are proper subjects of inquiry."

I suggest that those rules leave no room for a construction equated to what judges may regard as the "practicabilities of a situation" 85 years after the adoption of a constitution, or 80 years, or even 36 years, after adoption of amendments. The practicabilities no doubt have changed and will continue to change. So let us ignore present day marching bands, football crowds and the practicabilities of the situation, and, in construing the Constitution adopted in 1876, try to discover the conditions existing, the general spirit of the times, and the prevailing sentiments of the people, for the purpose of seeking an honest juridical answer to the meaning of the Constitution when it was adopted so as to give effect to the intent of the people who adopted it. Then in construing subsequent amendments to the Constitution, let us look at the history of the times out of which they grew and to which they may be rationally supposed to

have direct relationship, the evils intended to be remedied and the good to be accomplished.

I shall examine the three theories urged as supporting the constitutionality of the taxing provisions of Art. 2815h in the light of these rules.

### Appellee's Theory

This theory, as I have heretofore stated, is that Sec. 1, Art. VII and Sec. 48, Art. III confer power to levy ad valorem taxes *on the Legislature* which power the Legislature may validly delegate to junior college districts.

There is no provision in the Constitution expressly prohibiting the Legislature from levying and collecting ad valorem taxes for the support and maintenance of junior colleges. But constitutional limitations on legislative power are not always expressly stated in prohibitory language; they are sometimes necessarily implied in language granting powers. Language granting a narrow or restricted power necessarily excludes a broader or more general power over the same subject matter. Parks v. West, 102 Tex. 11, 111 S.W. 726. The basis for striking down legislation because of implied limitations on the power of a legislature to enact it is put in these words in Lytle v. Halff, 75 Tex. 128, 12 S.W. 610, 611:

"A prohibition of the exercise of a power cannot be said to be necessarily implied unless, looking to the language and purpose of the constitution, it is evident that without such implication the will of the people, as illustrated by a careful consideration of all its provisions, cannot be given effect."

Thus it is that to determine whether a constitution denies a particular power to a legislature, the courts must consider *all* constitutional provisions dealing with the subject of the power and harmonize them if possible. Jones v. Williams, 121 Tex. 94, 45 S.W.2d 130, 137, 79 A.L.R. 983.

When the delegates to the Constitutional Convention wrote the present Constitution, ratified by the people in 1876, they divided it into sixteen Articles. Each Article was devoted to a particular subject. The subject of Article III is "Legislative Department." The subject of Article VII is "Education—The Public Free Schools." The subject of Article VIII is "Taxation and Revenue." While the purity of the subject matter with relation to the subjects of these Articles has not strictly been observed through the intervening years, it is nevertheless obvious that all three of the Articles must be looked to in determining whether the Legislature is denied the power to levy a particular type of tax for educational purposes.

Sec. 1, Art. VII, confers on the Legislature unlimited power *to make provision* for the support and maintenance of "public free schools" in this language:

"A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools."

Sec. 48, Art. III, confers on the Legislature the specific power *to levy taxes* for the support of public schools, colleges and universities. The pertinent part of Section 48 reads as follows:

"The Legislature shall not have the right to levy taxes or impose burdens upon the people, except to raise revenue sufficient for the economical administration of the government, in which may be included the following purposes:

\*    \*    \*    \*    \*    \*

"The support of public schools, in which shall be included colleges and universities established by the State; \* \* \*."

It should be noted at this point that in 1927 the Legislature propounded to the then Attorney General of the State this question: "Has the Legislature the constitutional authority to enact a law providing for one or more school districts or counties to organize a junior college district and vote a tax for the support of such junior college?" In a one-page opinion in which he did no more than quote the identical language I have quoted from Sec. 1, Art. VII, and Sec. 48, Art. III, the Attorney General answered the question in the affirmative in this language: "We believe, under these provisions of the Constitution, it is the right and duty of the Legislature to make such provision for such schools and junior colleges as the Legislature in its wisdom deems best." It is enough at this point to state that in my opinion the Attorney General gave an incorrect answer to the question. And while an opinion of the Attorney General is entitled to great weight when the correct decision of a question is doubtful, 7 Tex.Jur.2d 9, Attorney General, § 11, particularly when it has gone unchallenged and has been acted upon by the Legislature or administrative agencies for a long period of time, Mumme v. Marrs, 120 Tex. 383, 40 S.W.2d 31, it cannot be binding on the courts when it is clearly wrong. Jones v. Marrs, 114 Tex. 62, 263 S.W. 570, 577; Jones v. Williams, 121 Tex. 94, 45 S.W.2d 130, 79 A.L.R. 983; Garcia v. Laughlin, 155 Tex. 261, 285 S.W.2d 191, 195. In deciding the question before us, we have no more right to exclude the influencing Sections of Article VIII from consideration than we have to excise them from the Constitution.

If Sec. 1, Art. VII, and Sec. 48, Art. III were the only constitutional provisions dealing with the subject, the power of the Legislative to levy ad valorem taxes for the support of junior colleges established by the State would be conceded, and the rate of the tax would be limited only by the legislative sense of the amount of money necessary for an "economical administration" of such colleges. Whether the Legislature could delegate the power to junior college districts, as is attempted by Article 2815h, is quite another question. It is also a question which other provisions of the Constitution eliminate from the case.

In its many sections Article III establishes the composition of the Legislative Department which is created in Article II, lays down basic rules governing its proceedings, and defines its powers. In that context Sec. 48, Art. III does nothing more than limit the taxing power of the Legislature to governmental purposes and state some of the purposes for which the Legislature may levy taxes. Friedman v. American Surety Co. of New York, 137 Tex. 149, 151 S.W.2d 570. The Legislature has been generous in the use of its power to tax for the *purpose* of supporting junior colleges. For the present biennium it has appropriated more than $13,750,000.00 of the proceeds of its tax levies for that purpose. Acts 1961, 57th Leg., 1st called session, ch. 62, p. 396. But Sec. 48, Art. III, neither grants the power to levy particular types of taxes, nor does it limit that power. Other sections of the Constitution do.

Specific authority for the levy of ad valorem taxes for or on behalf of the State Government is found in Sections 3 and 17 of Article VII, and a limitation on the power is found in Section 1-a of Article VIII. Sec. 3, Article VII, authorizes the levy and collection of an annual ad valorem tax at a rate not to exceed 35¢ on each $100 valuation of property to maintain and support the public schools of the State. Sec. 17, Art. VII levies an ad valorem tax of 2¢ on each $100 valuation for the payment of Confederate pensions and maintenance of the State Building Fund, and a tax of 5¢ on each $100 valuation for erection of buildings and permanent improvements at fourteen designated colleges and universities. There is no other constitutional provision empowering the Legislature to levy an ad valorem tax. Authority to fix the rate of the levy for the support of public schools is delegated by the Legislature to a Board consisting of the Governor, Comptroller and State Treasurer, Arts. 7041,

7043, Vernon's Texas Civil Statutes, and it is not even suggested that the full amount of the authorized tax for that purpose is not being levied and collected. Section 1–a of Article 8, adopted in 1948, provides that "From and after January 1, 1951, no State ad valorem tax shall be levied upon any property within this State for general revenue purposes." Under the rule heretofore stated, I conclude that the specific provisions contained in Sections 3 and 17 of Article VII for the levy of ad valorem taxes, plus the prohibition contained in Sec. 1–a, Art. VIII, necessarily imply that the levy by the Legislature of ad valorem taxes at any greater rate and for any other purpose is prohibited.

The implication finds solid confirmation in the history of the constitutional provisions dealing with the power of the Legislature to levy ad valorem taxes. Sec. 9, Art. VIII of the Constitution of 1876 provided: "The State tax on property, exclusive of the tax necessary to pay the public debt, shall never exceed fifty cents on the one hundred dollars valuation, * * *." The same Constitution contained Sec. 1, Art. VII and Sec. 48, Art. III, cited in the 1927 opinion of the Attorney General, in their present language. It is yet quite obvious that those sections did not enlarge the power of the Legislature to levy ad valorem taxes beyond the fifty-cent limitation. By amendment adopted in 1883, provision was made for the first time for levy by the Legislature of a special ad valorem tax for the support of public free schools. Sec. 3, Art. VII, was amended to authorize the levy of a State ad valorem tax of not to exceed 20¢ on the $100 valuation of property for that purpose, and Sec. 9, of Art. VIII, was amended to read: "The State tax on property, exclusive of the tax necessary to pay the public debt, *and of the taxes provided for the benefit of the public free schools,* shall never exceed thirty-five (35) cents on the one hundred dollars valuation; * * *." The maximum of the State levy for schools was raised from 20¢ to 35¢ by amendment in 1918. An amendment to Sec. 51, Art.

III, was adopted in 1912 to provide a State ad valorem tax levy of 7¢ on the $100 valuation for Confederate pensions. Sec. 9, Art. VIII, was not expressly amended at the same time, but by necessary implication it was amended to read: "The State tax on property, exclusive of the tax necessary to pay the public debt, and of the taxes provided for the benefit of public free schools *and for Confederate pensions,* shall never exceed thirty-five cents on the one hundred dollars valuation; * * *."

That was the status of relevant constitutional provisions when the Attorney General wrote his opinion in 1927. A State ad valorem tax levy of 7¢ was earmarked for Confederate pensions and a State ad valorem tax levy of not to exceed 35¢ was earmarked for the support of public free schools; and other than those levies the Legislature was expressly prohibited from levying an ad valorem tax in excess of 35¢. Since that tax was not earmarked by the Constitution for any specific purpose, it was a tax "for general revenue purposes." When the pension and school taxes and the tax of 35¢ for general revenue purposes were levied, the power of the Legislature to levy ad valorem taxes was absolutely exhausted, and no power for levying such taxes remained for delegation to junior college districts. Subsequent amendments to the Constitution have not enlarged the power. On the contrary they have restricted and diminished it.

In 1947, Sec. 17, Art. VII, was amended to reduce the levy for Confederate pensions from 7¢ to 2¢ and to provide a levy of 5¢ for buildings and permanent improvements at certain colleges. This same amendment reduced the levy for general revenue purposes in these words: "provided further, that the state tax on property as heretofore permitted to be levied by Section 9 of Article VIII, as amended, exclusive of the tax necessary to pay the public debt, and of the taxes provided for the benefit of the public free schools, shall never exceed Thirty (30¢) Cents on the One Hundred ($100.00) Dollars valuation." In 1948 Section 1–a of

Article 8, supra, was added by amendment. By that amendment the people took away completely the power of the Legislature to levy an ad valorem tax for general revenue purposes. That was the only source of power for levy by the Legislature of an ad valorem tax for the purpose defined in Sec. 48, Art. III of supporting "public schools, in which shall be included colleges and universities established by the State," unless the provision of Section 3 of Article 7 which authorizes a levy of a tax of not to exceed 35¢ "to maintain and support the public schools" be regarded as a source. And it is not suggested, nor could it successfully be urged, that the power to levy that State tax has been delegated to junior college districts. It would be wholly unreasonable to say that by taking away completely the expressly limited power of the Legislature to levy an ad valorem tax for general revenue purposes, the only ad valorem tax fund available for the support of colleges, and substituting an express prohibition of the power, the people somehow conferred an unlimited power which could be delegated to junior college districts. I reject appellee's theory for sustaining the constitutionality of the statutory provision. The general provisions in Sec. 1, Art. VII, and Sec. 48, of Art. III empowering the Legislature to *make provision* for the support and maintenance of public schools and to levy taxes for the support of public schools and colleges must give way to the express prohibition of the levy of *ad valorem taxes* for general revenue purposes. City of San Antonio v. Topperwein, 104 Tex. 43, 133 S.W. 416.

### Theory of the Concurring Opinion

The theory of the concurring opinion differs from the theory of appellees. The theory here is *not that the Legislature* has power to levy the tax which power may validly be delegated to junior college districts, but rather that the Legislature has inherent power to create junior college districts as political subdivisions and to con-fer ad valorem taxing power on them, which inherent power is somehow augmented or enlarged by Sec. 48, Art. III.

It may be admitted that the inherent power suggested exists *unless* that power is limited by the Constitution, expressly or by necessary implication. The power is not expressly limited. We need concern ourselves, therefore, only with the question of whether the power is limited by necessary implication. In examining this theory we need not concern ourselves with amendments to the Constitution. The inherent power of the Legislature to create or to authorize the creation of political subdivision known as "districts" with authority to levy ad valorem taxes is no greater today than it was when the Constitution was adopted in 1876. If it exists now, it existed then. It cannot have grown with the passage of time.

The people of Texas have written and adopted five constitutions, viz.: the Constitutions of 1836, 1845, 1861, 1866, 1869 and 1876. In every Constitution the Legislature has been directed to provide a system of education. In every State Constitution the direction has been in substantially the same language as that of Sec. 1, Art. VII of the present Constitution. The language had its origin in Sec. 1, Art. X of the Constitution of 1845, which provides (2 Gammel's Laws of Texas 1297):

"A general diffusion of knowledge being essential to the preservation of the rights and liberties of the people, it shall be the duty of the Legislature of this State to make suitable provision for the support and maintenance of public schools."

Moreover, every State Constitution has contained a separate Article on "Education," and each of the four prior State Constitutions expressly authorized the Legislature to levy *such property taxes,* without limitation as to amount or otherwise, as were necessary to provide a system of public free schools.

While the Constitutions of 1845, 1861, 1866, and 1869 each thus contained separate Articles dealing with a system of public schools and expressly directing the imposition of such property taxes as were necessary to provide them, none of those constitutions contained an Article devoted to taxation or an Article devoted to municipal corporations, as does the present Constitution. The inclusion of some of the provisions of these two Articles in the Constitution of 1876 is of overpowering significance in determining whether the delegates in writing that Constitution, and the people in adopting it, intended to deny to government, both state and local, the power to levy ad valorem taxes save as in the Constitution expressly authorized.

When the Constitution of 1876 was written and adopted, the only known governmental agencies or political subdivisions then having the power to tax property or to which the power might be delegated, were the Legislature, which exercised the power on behalf of the state government, and the counties, cities, towns and school districts, which exercised the power as local political subdivisions or municipal corporations. There was at the time no limit on the rate of property tax which cities could levy and collect except such as the Legislature might have imposed in granting charters.

Following adoption of the Constitution of 1869, the Legislature passed, in 1871, an "Act to give effect to the several provisions of the Constitution concerning taxes." (6 Gammel's Laws of Texas 945.) A prominent feature of the Act was the property taxes levied. Levied for state purposes was a tax of 50¢ on the $100 valuation, one-fourth for the benefit of the public schools and three-fourths for support of the state government. A tax of 25¢ on the $100 valuation was levied for the support of county governments, a tax of 25¢ for public roads and bridges, and a tax in every school district of 12½¢ for the year 1871 for the benefit of the public schools. Passed at approximately the same time was "An Act to organize and maintain a system of public free schools in the State of Texas." (6 Gammel's Laws of Texas 959.) A prominent feature of that Act was a provision which authorized the directors of each school district to levy and collect a property tax of $1.00 on the $100 valuation for building school houses and maintaining schools. There were some amendments to the tax Act before the Constitutional Convention of 1875, one of which authorized cities having assumed control of their schools to levy a tax of 25¢ on the $100 valuation for school purposes in addition to the taxes authorized by general law. (8 Gammel's Laws of Texas 533.)

Strong opposition to the heavy burden of ad valorem taxes had developed before the Constitutional Convention of 1875. The school district tax of $1.00 was under almost constant legal attack from the date of its imposition. Overtones of public and political opposition to the tax are to be found in the opinions of this court sustaining the validity of the tax in Kinney v. Zimpleman, 36 Tex. 554, State v. Bremond, 38 Tex. 116, and Hall v. Houston & T. C. R. Co., 39 Tex. 286, and in the opinion in seven consolidated cases, cited as Willis v. Owen, 43 Tex. 41, in which the tax finally was declared invalid.

In Terrell v. Middleton, Tex.Civ.App., 187 S.W. 367, 371, the court recognized that "The farmers of Texas constituted a large proportion of that convention [1875], and, [that] writhing under the exactions and extortions of the state government forced upon them, the pendulum swung from the extreme of riotous and irresponsive expenditure of public money to the extreme of close economy, if not penuriousness." It may be added to that declaration, without exaggeration, that the power to levy property taxes also swung from riotous and unrestricted freedom to closely restricted and guarded power at all governmental levels.

The first several days of the Convention of 1875 were devoted principally to the introduction of resolutions and their refer-

ence to standing committees. These resolutions reflect the thinking and the temper of the delegates. Among those introduced were a number dealing with taxes, principally property taxes.

On the fifth day of the convention the delegate from Wood County offered a resolution reciting that "In the nature of their government, the government has no right or power to impose burdens on them [the people] for any purpose whatever, except for revenue sufficient to administer the same," and resolving "that there ought to be a clause placed in the organic law restraining the Legislature, or taxing power of this State, from ever levying taxes upon the people for any purpose whatever, except revenue sufficient to strictly and economically administer the government." Journal 37.[2] Some of the language of that resolution found its way into Sec. 48, of Art. III. On the same day a delegate introduced a resolution that "no taxes shall be levied in this State for the purpose of keeping up public roads, * * *." Journal, 42. Another resolution recited that the State school fund of lands was "amply sufficient to educate the children of the State, of all classes and colors *forever*, without the necessity of *direct* taxation from the people for school purposes; * * *." Journal, 45. On the sixth day a resolution proposed to direct that no debt should "be contracted by any county or municipal corporation except with the consent of two-thirds of both branches of the Legislature, * * *." Journal, 51. Another proposed that special taxes to be levied by school districts should not "exceed twenty-five cents on the $100, for school purposes, * * *." Journal, 60. Another proposed authorization of a school district tax of "not exceeding one-half of one per cent" if voted by "two-thirds of the freeholders" of the district. Journal, 63. Another proposed a provision "That no taxes shall be levied or collected in this State for educational purposes, except as a poll-tax." Journal, 65–66.

On the seventh day a resolution was offered directing the suspension of the "tax of ¼ of one per cent levied for the year 1875 to keep up roads and bridges, until the Constitution now being framed shall be voted on by the people." Journal, 84. A resolution offered on the ninth day would have authorized the Legislature to levy a tax "of not more than one-tenth of one per cent," for the building and repair of bridges. Journal, 115. On the fifteenth day a resolution offered would have directed the Committee on Education to provide for a system of education on the basis of the available school fund "with an addition of an ad valorem tax of not less than one-tenth or more than one-eighth per cent." Journal, 190. Another resolved "That the Legislature nor any county shall ever levy and collect for county purposes a tax which shall exceed in the aggregate in any one year one-fourth of the amount of the tax levied by the State" except to build and keep in repair courthouses and jails. Journal, 191.

There were perhaps other resolutions on the subject not here noted, but those mentioned clearly reflect that the general spirit of the times and the prevailing spirit of the people in writing the Constitution was to place in the organic law drastic limitations on the power of the Legislature and all other political subdivisions to levy taxes on property. Most of the debates in the Convention on the subject of taxation collected and preserved to us by McKay in his Debates in the Constitutional Convention of 1875 have to do with taxation for the support of public schools. In view of the 1883 and subsequent amendments to Sec. 3 of Art. VII the debates throw little light on the determination to limit *all* ad valorem taxes, except that they reflect the full displeasure of the people with the extravagant use by government of the power to tax property.

To determine whether the people intended *when they adopted the Constitution* to limit the power of the Legislature to levy

---

2. All "Journal" references are to the Journal of the Constitutional Convention of 1875.

and to authorize the levy of ad valorem taxes by political subdivisions, we must look to all relevant provisions of the Constitution. As heretofore indicated, no prior constitution had placed any limitation on legislative power to levy ad valorem taxes. But in the Constitution of 1875 *express* limitations were placed on legislative power and on the power of every political subdivision or municipal corporation then known to the delegates of the Convention and to the people.

By Sec. 9, of Art. VIII, "Taxation and Revenue," an *express* limitation was placed on the power of the Legislature to levy ad valorem taxes for State purposes. It provided that "The State tax on property, exclusive of the tax necessary to pay the public debt, shall never exceed fifty cents on the one hundred dollars valuation." An *express* limitation was also placed on the power of counties, cities and towns to levy ad valorem taxes by the same Section of Art. VIII in these words: "and no county, city or town shall levy more than one-half of said State tax, except for the payment of debts already incurred and for the erection of public buildings not to exceed fifty cents on the one hundred dollars in any one year, and except as in this Constitution is otherwise provided." By Sec. 4, Art. XI, "Municipal Corporations," cities and towns having a population of 10,000 or less were authorized to levy and collect taxes to defray current expenses of government, but it was *expressly* provided that the tax should "never exceed, for any one year, one-fourth of one per cent." By Sec. 5, Art. XI like power was given cities and towns with more than 10,000 inhabitants, but it was *expressly* provided that "no tax for any purpose shall ever be lawful, for any one year, which shall exceed two and one half per cent of the taxable property of such City." When Art. XI was reported to the Convention by the Committee this latter provision permitted a maximum of five per cent but the Convention reduced it to two and one-half per cent. Journal, 694. By Sec. 7, Art. XI, gulf coast counties and cities were authorized, upon vote of two-thirds of the taxpayers, to levy and collect taxes for construction of sea walls, breakwaters and for sanitary purposes. By Sec. 10, Article XI, the Legislature was authorized to constitute any city or town an independent school district which, if it had a charter authorizing it to levy and collect a tax for the support and maintenance of a public institution of learning, could levy and collect a tax for that purpose upon a favorable vote of two-thirds of the taxpayers thereof. As this section was reported by the Committee it authorized levy of the tax upon a favorable vote of a simple majority of the taxpayers, but the Convention amended the Section to require authorization by a two-thirds majority. Journal, 790.

The only political subdivisions then existing and known to the convention delegates, other than counties, cities and towns, were school districts. When the Article on "Education" was reported to the Convention by the Committee, it contained no provision for special ad valorem tax support for public schools. Journal, 243–245. The delegates defeated an amendment authorizing school districts to levy ad valorem taxes not exceeding 25¢, Journal, 330, 332, an amendment authorizing the Legislature to levy a special ad valorem school tax of 12½¢, Journal, 518, 519, another amendment authorizing school districts to levy an ad valorem tax not exceeding 25¢, Journal, 519, 520, an amendment authorizing the Legislature to levy a tax in an unlimited amount, Journal, 520, 521, an amendment authorizing the Legislature to levy a special ad valorem school tax of not less than 10¢, Journal, 520, 521, and an amendment authorizing counties, cities and towns to levy an ad valorem school tax in any amount approved by vote of the freeholders. Journal, 538.

Any fair and judicial consideration of conditions existing in 1875 and 1876, the general spirit of the times and the prevailing sentiments of the people makes abundantly clear *that the intent of the people at the time the Constitution was adopted* was to deny to the State and its political sub-

divisions the power to levy and collect ad valorem taxes except as was expressly provided in the Constitution. In striking down the legislative act conferring taxing power on school districts in City of Fort Worth v. Davis, 57 Tex. 225, we referred specifically to the limitations imposed by Sec. 9, Art. VIII in concluding that "These repeated and guarded constitutional limitations of the taxing power are a prominent feature of that instrument [the Constitution], and are inconsistent with the existence of a legislative power to authorize additional taxation by school districts, unless some affirmative grant of that power can be found in the Constitution itself." They were just as inconsistent with the existence of a legislative power to authorize additional ad valorem taxation by any other political subdivision unless some affirmative grant of that power be found in the Constitution itself.

If the legislative act here under attack had been passed in 1880, who among us would doubt that the will of the people as illustrated by a careful consideration of all the provisions of the Constitution would have been frustrated by allowing the Act to stand? And who among us actually believes that this court would have indulged a moment's hesitation at that time in holding that the legislative power to enact it was prohibited by necessary implication? If the inherent power of the Legislature to pass the Act existed then or exists now, the time spent in drafting resolutions, the endless hours of debate, and the extreme care used in the 1875 Convention in the final writing of the Articles on Taxation and Revenue and Municipal Corporations will have been a futile tilting at windmills. All of the limitations placed on the ad valorem taxing power of the State and its political subdivisions will have been rendered nugatory; the Legislature can exorcise those limitations by the simple device of creating "districts" with ad valorem taxing power.

The power to authorize the levy of ad valorem taxes is *not* a necessary concomitant of the power to create a political subdivision for the performance of a governmental service. That it is not is clearly established by our decision in City of Fort Worth v. Davis, 57 Tex. 225. In that case we recognized the legal existence of school districts and of the power of the Legislature to create them, but held that the Legislature was impliedly prohibited from conferring ad valoren taxing power upon them. So it is here. The Legislature may create junior college districts and provide other means of financing them, but it is impliedly prohibited from conferring ad valorem taxing power upon them.

Once we admit that the Legislature has inherent power to create or to authorize the creation of "districts" with ad valorem taxing power, we must follow the doctrine to its end. We must agree that for the performance of any governmental function not otherwise delegated by the Constitution the Legislature could create a "district" with ad valorem taxing power. It could create such districts with ad valorem taxing power as "Tick Eradication Districts" and "Boll Weevil Eradication Districts." And since there is no *express* provision in the Constitution with respect to the manner in which the taxing power may be exercised by political subdivisions known as "districts," and no express limitation on the power of the Legislature to prescribe the manner of its exercise, the Legislature could authorize the tax levies without a vote of the people of the districts. There being no *express* limitation on the rate of tax that could be levied, the Legislature could authorize any rate it saw fit. Imagine how the delegates to the 1875 Convention would have felt if at the conclusion of their labors the Supreme Court had announced that in spite of their efforts to limit ad valorem taxation by all governmental agencies and subdivisions, the Legislature still had the inherent power to create innumerable political subdivisions with unlimited ad valorem taxing power to be exercised by boards of directors without a vote of the people of the districts. Wholly aside from the legal unsoundness of the *inherent power* argu-

ment, I suggest that as a practical matter it would lead to wholly unforeseen and unacceptable results.

The concurring opinion seems to indicate that Sec. 1, Art. VII, and Sec. 48, Art. III, somehow add to the inherent power argument; that while the provisions cannot authorize the Legislature *itself* to levy the necessary ad valorem taxes, they do authorize the Legislature to confer the power to levy the necessary ad valorem taxes on junior college districts created under its authority. There are a number of reasons why that reasoning is unsound.

The first reason why this line of argument is unsound is that if junior colleges fall within the direction to establish a "system of public free schools" under Sec. 1 of Art. VII and are included as a "public school" for the support of which the Legislature may tax under Sec. 48 of Art. III, then the argument is foreclosed by our decision in City of Fort Worth v. Davis where, with these identical provisions before us, we held the Legislature did *not* have power to authorize a school "district" to impose ad valorem taxes for the support of its schools.

The second reason is that Sec. 48 of Art. III by its plain wording speaks only to the power of the Legislature *itself* to levy taxes and not to taxing powers which may be conferred upon school districts, junior college districts, or any other type of district or political subdivision. See Storrie v. Houston City St. R. Co., 92 Tex. 129, 46 S.W. 796, 44 L.R.A. 716.

The third reason is that the argument adds *absolutely nothing* to the inherent power argument. If Sec. 48 of Art. III empowers the Legislature to confer ad valorem taxing power on "districts" created by it for carrying out the purposes enumerated therein, there are seven other purposes, just as prominent in the section as the "public school" purpose, for the attainment of which the Legislature may create "districts" with ad valorem taxing power. And the seven

enumerated purposes do not exhaust the list, for we held in the Friedman case that Sec. 48 authorized the Legislature to tax for *any and all* proper governmental purposes. Thus we come full circle to the necessary conclusion that Sec. 48 of Art. III adds absolutely nothing to inherent power. Incidentally, this court's holding in Friedman that the purposes for which the Legislature could tax were not limited to those enumerated in Sec. 48 but included any governmental purpose is contrary to the construction put on the Section by at least some of the delegates to the Convention. In offering the amendment to include support of colleges and universities, Mr. Davis, the delegate from Brazos, stated: "By that Section [48] it is seen that the Legislature is prevented from making any appropriation hereafter for colleges or universities; it is prohibited from imposing any tax whatever on the people for any other objects than those specified in this section." McKay's Debates, p. 144. I regard the matter as foreclosed to the contrary by the Friedman decision and by the actual wording of the section.

The concurring opinion places great emphasis on long acquiescence in Legislative construction, and yet uses Sec. 48, Art. III and inherent power of the Legislature as bases for upholding the validity of the Act. The legislative construction *is* clearly shown to arise directly out of and to be based upon the Attorney General's opinion of 1927 which cites only Sec. 1 of Art. VII and Sec. 48 of Art. III. But for at least fifty-eight years the Legislature has construed Sec. 48 of Art. III as *not* authorizing it to confer ad valorem taxing power on "districts" created for the performance of other governmental functions. For the same period of time it has construed the Constitutional limitations on the power of political subdivisions to levy ad valorem taxes as limiting the inherent power of the Legislature to grant such authority to "districts;" in every other instance in which the Legislature has wished to confer ad valorem taxing power on a "district" political subdivi-

sion, it has thought that an amendment of the Constitution was prerequisite.

In 1904 an amendment was submitted and adopted authorizing the creation of levee, navigation, irrigation, drainage, flood control and road districts, with power to incur bonded indebtedness and to levy ad valorem taxes to pay the same. Sec. 52, Art. III. In 1917 an amendment was submitted and adopted authorizing the creation of conservation and reclamation districts with power to incur bonded indebtedness and to levy ad valorem taxes to pay the same and for the maintenance of improvements. Sec. 59, Art. XVI. An amendment for a special tax to be levied by Harris County and its road districts was submitted and adopted in 1937. Sec. 52d, Art. III. Five separate amendments, submitted and adopted in 1954, 1958 and 1960, authorized the creation of hospital districts with power to levy ad valorem taxes. Secs. 4, 5, 6, 7 and 8, Art. IX. An amendment was submitted and adopted in 1949 authorizing the creation of rural fire prevention districts with power to levy ad valorem taxes. Sec. 48d, Art. III. On November 6th some five other amendments authorizing the creation of hospital districts with ad valorem taxing power were submitted, one or more of which at my last reading appear to have been defeated. I hardly see how we could have a more consistent legislative construction that its power to create "districts" and give them ad valorem taxing power is prohibited by the Constitution.

By a quotation from the Friedman case the concurring opinion suggests that perhaps these amendments were mere referenda. Our decisions show that they have been recognized as having binding force. See Munson v. Looney, 107 Tex. 263, 172 S.W. 1102, 177 S.W. 1193; Dallas County Levee Dist. No. 2 v. Looney, 109 Tex. 326, 207 S.W. 310. It can hardly be seriously suggested that if the amendments I have mentioned had been defeated, the Legislature could nevertheless create the district and confer ad valorem taxing power upon

the various districts on the theory that submission of the amendments was only referenda.

### Theory of the Majority Opinion

The majority opinion rests the power of the Legislature to confer ad valorem taxing authority on junior college districts entirely on Sec. 3, Art. VII of the Constitution and subsequent amendments thereto. I suggest that if the sound rules of constitutional construction heretofore reviewed are applied to this section of the Constitution and its amendments the conclusion is inescapable that they have no application to any type of college district, junior or senior. This court first recognized this as a fact in Mumme v. Marrs, 120 Tex. 383, 40 S.W.2d 31, 33, decided after the last amendment of the section, when, in analyzing Art. VII, we said:

"This article discloses a well-considered purpose on the part of those who framed it to bring about the establishment and maintenance of a comprehensive system of public education, *consisting of a general public free school system and a system of higher education.*"

Whether the quoted statement was made by this court merely from viewing the arrangement of the sections of Art. VII or only after a close study of its history is not disclosed in the opinion in Mumme v. Marrs. Both support it as a sound and correct statement.

### 1. Arrangement of Sections of Art. VII.

An Article on "Education" first appeared in the Constitution of 1845. Similar Articles were in the Constitutions of 1861, 1866 and 1869. In most respects the content of the Articles was the same. All made provision for a permanent school fund, consisting principally of lands and the money derived from the sale thereof, and for an available school fund. All were concerned with the establishment of an efficient system of public free schools and that objec-

tive was announced in Sec. 1 in each instance. In none of them was mention made of colleges and universities. That is understandable. There were no public colleges or universities in the State. Provision had been made for the endowment of a university with public lands, but bickering and discord had prevented its establishment.

When the delegates to the Constitutional Convention met in 1875 there were still no public colleges or universities in operation in the State. Some of the delegates, particularly the delegate from Brazos, were concerned with the establishment of the Agricultural and Mechanical College for which a federal grant had been made; some were concerned with the ultimate realization of the dream of a university; all realized that equal college facilities must be provided for Negroes. And although scores of private colleges, academies, institutes and seminaries, male, female, and male and female, had been chartered by special acts of the Legislature, and were offering courses of study beyond the ordinary common school level, junior colleges, private or public, were unheard of, here or elsewhere in the United States.

As finally written and included in the Constitution of 1876, Art. VII is entitled "Education—Public Schools." 8 Gammel's Laws of Texas 781. The first eight sections have no separate caption, but they speak only of public free schools and follow the subject matter pattern of the Articles on Education in all prior State Constitutions which had never dealt with colleges. The ninth Section is captioned, "Asylums," and makes provision for asylums for the insane, the blind, the deaf and orphans. The last six sections are under the caption, "University," and make provision for a university, A. & M. College and a college for colored youths. I agree with the statement of this court in Mumme v. Marrs, 120 Tex. 383, 40 S.W.2d 31, 33, that the provisions of the last six sections have never been regarded as a limitation on the power of the Legislature to establish other

colleges and universities. I assert, however, that the very arrangement of the sections indicates an intention that colleges and universities were not dealt with in the first eight sections of the Article and were not to share in any of the benefits or powers provided therein for public free schools. Mere arrangement of the sections is not the only basis for that conclusion. Convention history supports it.

2. *Convention History of Art. VII.*

When Art. VII was reported to the convention by its Committee on Education it contained only nine sections which related essentially to the same subject matter embraced in the first nine sections as finally adopted. It contained no sections relating to universities or colleges. Journal, 243, 245. After lengthy debate, centering for the most part around Sec. 3 and efforts to amend that section to enlarge, diminish, and to eliminate altogether the power to tax for the support of public schools, the entire Article was referred to a select committee for further consideration. Journal, 337. The select committee reported the Article back in substantially the same form as originally reported except that there were eight numbered sections captioned, "Public Free Schools," and an unnumbered section captioned, "Asylums." Journal, 395–397. The fractional limitation of the general revenue of the State which could be set apart "for the benefit of the public free schools," contained in Sec. 3, had been changed from one-tenth to one-fourth. There were still no sections in the Article relating to universities or colleges. The Article thus framed and entitled "Article ———, Public Schools," Journal 510, 511, 516, was engrossed on the 48th day of the Convention, Journal, 523, and was finally passed on the 54th day. Journal, 615, 616.

Many of the speeches of delegates participating in the debates on Art. VII as engrossed and passed are quoted at length by McKay. Some speakers favored more liberal tax support for public schools and some favored none at all. The speakers on both

sides debated the wisdom and necessity of providing a "common school education" for the children of the State and "education of the masses." There is in McKay's collection of speeches not a single indication that any of the delegates thought or intended that the Article thus approved was to provide for a system of education above the common school level. There is not even a mention of colleges and universities in these debates. In point of fact, the Committee on Education was at that very time engaged in writing a separate Article on colleges and universities.

The Committee on Education had before it at least three resolutions relating to the establishment of a university. Journal, 104, 134, 619. The Committee made no report on the subject until the 62nd day of the convention, eight days after the Article on Public Schools had been finally passed. Journal, 691, 693. The report was captioned "Art. —— University," contained six sections, provided for the establishment of The University of Texas and a college for colored youth, and constituted A. & M. College a branch of The University of Texas. The Article was engrossed and finally passed as a separate Article. Journal, 783, 784, 789. Evidently the Committees on Enrolled Ordinances and Style and Arrangement combined the Article captioned, "University," and the Article captioned, "Education— Public Free Schools," for as the Constitution was finally adopted both appeared as parts of Art. VII.

The foregoing history of Art. VII should demonstrate that with the framers of the Constitution "public free schools" and "colleges and universities" were wholly different concepts and different institutions of learning to be dealt with separately.

3. *1883 Amendment of Sec. 3, Art. VII.*

While the majority opinion would seem, at first blush, to hold that legislative power to pass the act in question is conferred by the 1909 Amendment of Sec. 3, Art. VII, closer analysis indicates that reliance on the 1909 Amendment is principally for the pur-pose of attempting a tenuous distinction between the decision in this case and the decision in Williams v. White, Tex.Civ. App., 223 S.W.2d 278, writ refused. If the power has been conferred by any amendment, it was conferred by the 1883 amendment; and I submit that there is no sound basis for holding that it was conferred by that amendment.

When the Constitution was adopted in 1876, Sec. 3 of Art. VII read:

"There shall be set apart annually not more than one-fourth of the general revenue of the State, and a poll tax of one dollar on all male inhabitants in this State between the ages of twenty-one and sixty years, for the benefit of the public free schools."

Sec. 5, Art. VII provided that interest arising from the permanent school fund and the taxes authorized and levied in the Constitution should constitute the available school fund. These were the only constitutional provisions in Art. VII dealing expressly with the financing of the system of public free schools which the Legislature was directed in Sec. 1 of that Article to establish. In addition, there was Sec. 10 of Art. XI, heretofore mentioned, authorizing cities and towns having control of their schools and having charter provisions authorizing the levy of a tax for the support of "a public institution of learning," to levy such tax upon an approving vote of two-thirds of the taxpayers. These were the existing constitutional provisions when City of Fort Worth v. Davis was decided in 1881.

The Legislature had passed an Act permitting *any* city or town which had assumed control of its public schools to levy a tax for the support of its schools. The City of Fort Worth had voted to assume control of its schools and with an approving vote of its taxpayers sought to levy a school tax of 25¢ on the $100 valuation for the support of its public schools. Davis and other taxpayers filed suit to enjoin collection of the tax on the grounds that the statute authorizing the tax was unconstitutional and that

the election by which the City had assumed control of its schools was invalid because of irregularities. The trial court held the statute unconstitutional and enjoined collection of the tax without hearing evidence on the claim of election irregularities. Upon appeal to this court the City sought to sustain constitutionality of the statute by asserting that it was authorized by Sec. 1 of Art. VII and by Sec. 10 of Art. XI. This court made a direct holding that it was *not* authorized by Sec. 1 of Art. VII but held that it was authorized by Sec. 10 of Art. XI. However, the court held the election was invalid because the rate of tax levy was not submitted in terms of the statute. City of Fort Worth v. Davis, 57 Tex. 225.

It is asserted in some of the briefs that the holding that the statute was not constitutionally authorized by Sec. 1, Art. VII is a dictum. It is unnecessary to write on this matter at length. The question was squarely presented and squarely decided.

The 1883 Amendment was submitted at the first regular session of the Legislature following our decision in City of Fort Worth v. Davis and thus at the Legislature's first opportunity to correct the deficiency this court had said inhered in the Constitution. The amendment continued the financing provisions of the original Section 3 "for the benefit of the public free schools," authorized an additional state ad valorem tax of not to exceed 20¢ on the $100 valuation as, with the available school fund, would be sufficient to support and maintain "the public free schools" for a period of six months each year, and then provided:

" * * * and the Legislature may also provide for the formation of school districts within all or any of the counties of this state, * * * and may authorize and additional annual ad valorem tax to be levied and collected within such school districts for the further maintenance of public free schools and the erection of school buildings therein; * * *."

The local tax could not exceed 20¢ on the $100 valuation.

There is nothing in the quoted language indicating that the Legislature in writing it or the people in approving it had any different concept of "school districts" or of "public free schools" than that held by the framers of the original Constitution. The "evil to be remedied" was pointed out in City of Fort Worth v. Davis. That decision related only to school districts maintaining and operating common schools, and the opinion dealt only with the power of the Legislature to authorize school districts to levy ad valorem taxes for the support of public free schools. The amendment dealt only with the power to authorize school districts to levy ad valorem taxes for the support of public free schools and the erection of buildings to house them. If Sec. 3 of Art. VII had theretofore related only to public free schools, and not to colleges, there was certainly nothing in the amendment to make it relate to colleges thereafter. The section before amendment spoke only of "public free schools" and the amendment itself spoke only of "public free schools." There was reason why the amendment did not speak of junior colleges. They were still unheard of in Texas or elsewhere in the nation.

According to one author, the first *private* junior college in the United States was Decatur Baptist College, established in Decatur, Texas in 1898. Evans, The Story of Texas Schools, p. 159. Eby and Pittenger credit its establishment in 1897. University of Texas Bulletin No. 3126, a Study of the Financing of Public Junior Colleges in Texas. Joliet Junior College, in Illinois, established in 1902, was the first *public* junior college in the United States. Evans, ibid. Eby and Pittenger state that the public junior college did not make its advent in Texas until 1920 when one was established in El Paso. Evidently they speak only of *local* public junior colleges, for the Legislature established state junior colleges at Arlington and Stephenville in 1917. See Acts Reg.Sess., 35th Leg., chs. 33 and 97, pps.

58 and 260. Keeping these dates in mind, it seems to me that of one thing we may be certain: There neither was, nor could have been, any intention on the part of the people in adopting the 1883 Amendment to provide for the levy of ad valorem taxes by junior college districts for the support of junior colleges.

### 4. *1909 Amendment of Sec. 3, Art. VII.*

An amendment to Sec. 3, Art. VII, raising the permissible local tax from 20¢ to 50¢ was submitted in 1907, 13 Gammel's Laws of Texas 413, and adopted in 1908. In 1908 this court held in Parks v. West, 102 Tex. 11, 111 S.W. 726, that the provision in the 1883 Amendment empowering the Legislature to provide for the formation of school districts "within all or any of the counties of this state" impliedly prohibited formation of school districts consisting of parts of more than one county. In response to this decision the Legislature submitted and the people adopted the amendment of 1909. 14 Gammel's Laws of Texas 250. The language added by the 1909 Amendment, although revised in punctuation and other unimportant particulars by subsequent amendments, basically was the language of the Constitution when Art. 2815h was passed in 1929 and still is today. The language added read:

"* * * and the Legislature may also provide for the formation of school districts * * *, and all such school districts * * * may embrace parts of two or more counties. And the Legislature shall be authorized to pass laws for the assessment and collection of taxes in all said districts and for the management and control of the public school or schools of such districts, whether such districts are composed of territory wholly within a county or in parts of two or more counties. And the Legislature may authorize an additional ad valorem tax to be levied and collected within all school districts, heretofore formed or hereafter formed, for the further maintenance of public free schools, and the erection and equipment of school buildings therein, * * *."

The "evil to be remedied" by the 1909 Amendment was that which had been pointed out in Parks v. West. There is certainly nothing in the language of the amendment indicating that the people in adopting it intended it to have any other purpose; and nothing in it, or out of it, indicating that the Legislature or the people intended it to authorize the creation of school districts with ad valorem taxing power for the operation and maintenance of colleges or institutions of higher learning. The public junior college in this State was still many years away.

### 5. *Junior College Districts are not Public School Districts Operating Public Free Schools.*

Junior college districts are not public school districts in what was the generally understood and accepted meaning when the Constitution was adopted or when the various amendments thereto were adopted, nor are they public school districts in the generally understood and accepted meaning today. They are *college* districts superimposed upon independent and common public school districts, usually with separate trustees or directors and with separate taxing power, completely independent of the public school districts upon which they are superimposed. They are separate political subdivisions and quasi-municipal corporations. The fact that the junior colleges operated by junior college districts offer certain courses of study which are offered in the public schools does not make the colleges free public schools or the districts public school districts within the meaning of Sec. 3, Art. VII. Senior colleges also offer many courses of study which are offered in the public schools but they are not *free* public schools within the meaning of Sec. 3, Art. VII.

Neither do junior college districts operate public *free* schools within the meaning of the Constitution. During the year 1960–1961 charges to students paid 34.9% of

junior college total costs. The schools operated by junior college districts are not even free to those who live in the districts.

## 6. *Majority Conclusion is Contrary to Legislative Construction*

The Legislature has repeatedly recognized that junior colleges established under the provisions of Art. 2815h are not "public schools" within the meaning of Sec. 3, Art. VII, but are institutions of higher learning. (a). The State began making appropriations to junior colleges in 1941. The appropriation bill in that year, as well as those for 1943 and 1945, contained a provision requiring junior colleges receiving state aid to collect matriculation and other fees not less than "the amounts provided by law and by *other state supported institutions of higher learning.*" See Acts Reg.Ses., 47th Leg., ch. 483, p. 778; Acts Reg.Ses. 48th Leg., ch. 157, p. 257; Acts Reg.Ses., 49th Leg., Ch. 234, p. 319. (b). Junior colleges are made subject to the provisions of Art. 2654c V.A. T.S., requiring the collection of tuition fees, which Article is by its terms made applicable to *"the several institutions of collegiate rank* supported in whole or in part by public funds appropriated from the State Treasury." (c). No provision is made for the furnishing of free text books to junior college students as Sec. 3, Art. VII requires "for the use of children attending the public free schools of this State." (d). Sec. 5, Art. VII requires that the available school fund shall be apportioned to the various counties "according to their scholastic population", and yet from the time of its enactment in 1929 Art. 2815h has provided that "No funds received for school purposes from the State Available School Fund * * shall be used for the establishment, support, and maintenance of the Junior College. * * *" See Acts Reg.Ses., 41st Leg., ch. 290, p. 648, Sec. 14; Art. 2815h, § 14. (e). For many years students in junior colleges were by statute classified with students in all other institutions of higher learning for the purpose of qualifying for teacher's certificates. Acts 37th Leg., ch. 129, p. 242.

## 7. *Majority Conclusion is Contrary to Decided cases*

There are cases from other jurisdictions arising in analogous fact situations in which it has been held that colleges were not comprehended by the term "public schools."

In Merrick v. Inhabitants of Amherst, 12 Allen (Mass.) 500, the Supreme Court of Massachusetts held that a constitutional provision "that all moneys raised by taxation * * * for the support of the public schools * * * shall be applied to and expended upon no other schools * * *" prohibited the expenditure of money, raised by taxes, on an agricultural college, and declared unconstitutional a statute authorizing the expenditure, saying: "The phrases 'public schools' and 'common schools' have acquired under the legislation and practice of this State a well-settled signification. They are never applied to the higher seminaries of learning such as incorporated academies and colleges."

In re Opinion of the Justices, 214 Mass. 599, 102 N.E. 464, the Supreme Court of Massachusetts held that a constitutional provision that "no money raised by taxation for public schools shall be appropriated to any religious sect for the maintenance of its own school" prohibited the use of tax monies raised for public schools being used for sectarian common schools but did not prohibit their use for support of sectarian higher educational institutions of learning. The court said: "Public schools never have been understood to include higher institutions of learning like colleges and universities."

In Board Regents Normal School-Dist. No. 3 v. Painter, 102 Mo. 464, 14 S.W. 938, 10 L.R.A. 493, the Supreme Court of Missouri held that land conveyed "for the establishment of a public school" could not be donated to a state normal school by the town to which it was conveyed. The court, in referring to state normal schools, said: "While they are supported, in the main, from the public treasury, and are part of the school system of this state, still, we think,

it is clear they are not 'public schools,' within the meaning of the Lorimer deed."

The Kentucky case of Pollitt v. Lewis, 269 Ky. 680, 108 S.W.2d 671, 113 A.L.R. 691, is particularly apposite and persuasive. A constitutional provision read: "No sum shall be raised or collected for education other than in common schools until the question of taxation is submitted to the legal voters, * * *." An act of the General Assembly purported to authorize the organization of local junior colleges with authority to levy property taxes without the holding of an election. The Court of Appeals held that part of the act unconstitutional. Much of the court's opinion is worth repeating here. It said:

"* * * If the term 'common schools' had a definite meaning in the minds of the draftsmen of the Constitution, it is our duty to give it effect. We must always recognize that we are construing and not constructing that instrument. * * *"

The court reviewed some of the arguments of the Constitutional Convention, and continued:

"Without a further extension of this opinion with quotations from the numerous arguments of the members of the Constitutional Convention relating directly to this subject, it will suffice to say that they demonstrate beyond all shadow of a doubt that the members of the convention did not conceive a college to be embraced in the ambit of the term 'common school.' * * *"

The court noted that the term " 'common schools' had and has a fairly definite signification and, whatever else it may include, it does not include a college." The court concluded: "Plainly, a junior college such as here proposed is, and can be, no part of the common school system * * *." How appropriately these things can be said of the case before us if we recognize, as we should, that the terms "school districts" and "public free schools" as used in Sec. 3, Art. VII have had a well settled and publicly recognized signification since the writing of the Constitution in 1875!

8. *Majority Conclusion is in Irreconcilable Conflict with Williams v. White*

In the beginning of this opinion I referred to our decision in Williams v. White. By fractionalizing Sec. 3, Art. VII the majority have sought to harmonize their conclusion here with the decision in Williams v. White. It is said that arrangement of the language of the section justifies the holding in Williams v. White that junior college districts are not public school districts so as to be subject to the territorial limitations of the section and yet are public school districts so as to be entitled to the taxing powers therein conferred. The majority have *the power* to make the holding, but they have not the power to make the two holdings logical or harmonious.

Sec. 3, Art. VII does not lend itself to pulverization in any such fashion. The section deals with only one general subject—the formation of school districts and the financing of public free schools to be housed and maintained by such districts. Junior college districts operating junior colleges are such districts or they are not. That is precisely the question which was presented to and decided by the Court of Civil Appeals and by this court in Williams v. White. The case was briefed and presented by two of the ablest attorneys in this State. Those attacking the taxing power of the junior college district did so on the ground that Sec. 3, Art. VII was applicable to junior college districts and that the district was not constitutionally formed under the limitations of the section. The answer to the attack in the Court of Civil Appeals and in this court was that the provisions of the section were not applicable because a junior college district was not a "school district" and a junior college was not a "public free school" within Sec. 3, Art. VII. It was that broad issue which was decided by the Court of Civil Appeals in this language:

"* * * *the Constitution seems to make a distinction between the public*

*free schools (the first seven sections of Article 7 of the Constitution) and other types of educational institutions such as colleges and universities which are above the high school level of difficulty and generally referred to as institutions of higher learning.* This distinction seems to have been recognized by the legislative and executive branches of our government as pointed out and discussed by Chief Justice Cureton in Mumme v. Marrs, 120 Tex. 383, 40 S. W.2d 31. *We regard the case cited as authority for the proposition that the asserted limitation of Article, 7, § 3, of the Constitution is not appplicable to junior colleges."* (emphasis added).

The holding that the limitation did not apply was thus predicated upon a conclusion that the first seven sections of Art. VII, including Section 3, did not apply to junior colleges because they were institutions of higher learning and not public free schools. That is the conclusion which this court adopted by refusing writ of error. If the conclusion was correct the majority holding here is erroneous.

### Consequences of Majority Holding and Need for Constitutional Amendment

This decision settles, of course, the constitutionality of that part of Art. 2815h which confers ad valorem taxing power on junior college districts. In settling that question, however, the majority opinion raises other serious constitutional problems. 1. If junior college districts created by the Legislature are "school districts" maintaining junior colleges as "public free schools", within the meaning of Section 3, Art. VII, by the same reasoning the Legislature can create senior college districts for the operation of senior colleges with four years of study, a graduate school and any number of professional schools, as "public free schools", and authorize them to levy ad valorem taxes for support and maintenance of such colleges. 2. It will qualify junior college districts for participation in the pro-

ceeds of the 35¢ ad valorem tax levy authorized in the first part of Section 3 "to maintain and support the public schools of this State." 3. It will entitle junior college students to free text books under the provision of Section 3 which requires the State Board of Education to set aside a sufficient amount of the 35¢ ad valorem tax to provide "free text books for the use of children attending the public free schools of this State." 4. It will entitle junior college districts to share in the revenue from the one-fourth of State occupation taxes and the one dollar poll tax required by Section 3 to be "set apart annually for the benefit of the public free schools." 5. It will give junior college districts an interest in public school lands and in money derived from the sale thereof, which Sec. 2, Art. VII of the Constitution declares "shall constitute a perpetual public school fund." 6. It will entitle them to share in any distributions of the available school fund created by Sec. 5, Art. VII, which that Section directs "shall be applied annually to the support of the public free schools," and this in spite of the fact that the Section further provides that "no law shall ever be enacted appropriating any part of the permanent or available school fund to any other purpose whatever." 7. It will entitle them to share in the income from county school lands and in the income from the proceeds derived from the sale thereof, which section 6, Art. VII directs "shall be held by said counties alone as a trust for the benefit of public schools therein." Unless all rights and benefits conferred on public school districts and public free schools by the first seven sections of Art. VII are granted to junior college districts and junior colleges or they are taken away by constitutional amendment, a decade of confusion and litigation seems assured.

There is yet another serious question which has arisen in the course of my investigation. It involves the constitutional power of the Legislature to appropriate any of the proceeds of state tax levies for the support and maintenance of local junior colleges. If the power exists it must exist by virtue

of the provisions of Sec. 48, Art. III of the Constitution which authorizes the Legislature to levy taxes for "The support of public [free] schools, in which shall be included colleges and universities established by the State; * * *." When Article III of the Constitution was reported to the Convention by the Committee on the Legislative Department the pertinent part of Sec. 48 authorized the Legislature to levy taxes only for "The support of public schools." Journal, 163, 164. An amendment was offered to add: "And colleges and universities under control of the State." The amendment was defeated. Journal, 225. On reconsideration an amendment to the amendment was offered, reading: "and such other colleges, universities and normal schools as may be established by law." This amendment was defeated. A substitute amendment was then offered, reading: "in which shall be included colleges and universities established by the State." The substitute was adopted and its language is the language of Sec. 48. Journal 283. The record thus reveals that the words designating the type of colleges and universities to be supported by taxes levied by the Legislature were chosen with great care. To be supported were those colleges and universities *established by the State* rather than those *established by law* or those *under control of the State*. While Art. 2815h requires that the establishment of junior colleges must be with the consent and approval of the State Board of Education, they definitely are not *established by the State*. According to the express language of the statute the various types of junior colleges are *established* by independent school districts, cities which have assumed control of their schools, two or more contiguous independent school districts, two or more contiguous common school districts, a combination of one or more independent school districts with one or more common school districts of contiguous territory, a county or a combination of counties. Thus public junior colleges are *established by law* and are *under control of the State* but they are not *established by the State*.

*Conclusion*

I wish I could get my consent to agree to the constitutionality of this statute. I cannot. In my best judgment none of the theories advanced support the decision and the taxing provisions of Art. 2815h are clearly unconstitutional. This is the type of case to which Cooley referred. True, the Legislature has not willfully *usurped* an unconstitutional power; it doubted that it had the power, and exercised it only upon assurance of the Attorney General that it had it. The power has been exercised, however, and now "large interests [are] enlisted under it" so that it is difficult to "venture to declare it void." Still, I share his view that "in construing constitutions, courts have nothing to do with the argument *ab inconvenienti*, and should not 'bend the Constitution to suit the law of the hour.'"

I would reverse the judgment of the trial court and grant the injunction.

WALKER, J., joins in this dissent.